KUSKIN, J.T.C.
Plaintiff Hunterdon Medical Center (“HMC”) operates a hospital in Flemington, New Jersey (the “Hospital”) and owns the property in Readington Township that is the subject of this appeal. The property, designated as Block 34, Lot 31.01 on defendant’s tax map, is located approximately nine and one-half miles from the Hospital campus, and contains a three-story building (the “Subject Building”) -with approximately 26,000 square feet of floor area. For each of the tax years under appeal, 2000, 2001, and 2002, the total tax assessment on the property was $3,300,000, of which $2,000,000 was allocated to the Subject Building. HMC contends that, during the years under appeal, approximately 21,-400 square feet of the Subject Building, occupied by facilities owned and operated by HMC and staffed by its employees, were used for hospital purposes and therefore qualified for tax exemption under N.J.SA. 54:4-3.6. The facilities in issue are a Wellness Center (the “Wellness Center”), a physical therapy service (the “PT Service”), a cardio-pulmonary rehabilitation service (the “CP Rehab Service”), and a pediatric practice (the “Pediatric Practice”). HMC does not seek exemption for the remainder of the Subject Building, consisting of office space leased to cardiologists in private practice.
HMC’s appeal was the subject of a plenary trial followed by the submission of briefs and proposed findings of fact and conclusions of law. Based on the testimony and documents presented at trial, my evaluation of the credibility of the witnesses, and the post-trial submissions by the parties, I hold that, for each of the years 2000, 2001, and 2002, the only portion of the Subject Building qualifying for exemption was the area used exclusively by the CP Rehab Service.
*307 I.
The Subject Building
The Subject Building is a three-story structure containing a total of 26,055 square feet. During the years under appeal, 2925 square feet on the second floor were leased to the private cardiology practice. The Wellness Center contained a total of 18,546 square feet with approximately 16,000 square feet located on the first floor of the Subject Building and approximately 2500 square feet located on the second floor. The PT Service treatment room was located on the second floor of the Wellness Center and the CP Rehab Service office was on the first floor. The Pediatric Practice occupied 4584 square feet on the third floor.
The Wellness Center contained facilities and equipment similar to those found in a commercial fitness center or health club. The first floor included a reception area, a small shop selling a limited number of clothing items, batteries and other equipment related to exercising at the facility, locker rooms for men and women, a swimming pool area containing approximately 2700 square feet, a child care room, classroom, aerobics studio, and a general exercise area including a running track, aerobic exercise equipment, and weight training equipment. The second floor space included an area devoted exclusively to the PT Service (consisting of an assessment office and treatment room), an area containing four pieces of exercise equipment used specifically for physical therapy but available for use by the general membership of the Wellness Center, and an area containing exercise equipment available for use by all members. The PT Service used equipment on the first and second floors of the Center and the swimming pool. Other than an office on the first floor, CP Rehab Service had no area of the Wellness Center or equipment dedicated to its use, and persons receiving rehabilitation services used various items of exercise equipment located on the first floor of the Center and used the swimming pool. All equipment in the Wellness Center was available for use by the general membership.
Membership in the Wellness Center was open to the public, and the membership fee structure was competitive with commercial *308 fitness facilities and health clubs in the vicinity. In 1999, the Center’s total membership was 2047, of which 1934 members were from the general public with the balance being HMC staff or other employees of the Hunterdon Healthcare System (HMC’s parent entity) who were charged discounted membership fees. In 2000, the total membership was 2304, of which 2297 were from the general public, and, in 2001, the total membership was 2097 with 2004 of those members being from the general public. During each year under appeal, approximately 1000 guests used the Wellness Center (with each paying a fee for limited time use of the facilities), approximately 40 people received physical therapy, and approximately 35 people received cardio-pulmonary rehabilitation services. Non-members of the Wellness Center could receive personal training and massages at the Center. The Wellness Center was open from 6:00 a.m. to 10:00 p.m., Monday through Friday, and during somewhat shorter hours on Saturday and Sunday.
The staff of the Center consisted of sixty or seventy employees including a director, office manager, front desk coordinator, exercise physiologist, personal trainers, fitness trainers, massage therapists, and aerobic, swimming and other special program instructors. The director, whose background was in commercial health clubs and not in medically based fitness programs or facilities, hired all staff, using criteria similar to those used by commercial health clubs. Neither HMC’s human resources department nor the Wellness Center’s medical director (described below) participated in the hiring process. Many of the employees worked full-time at the Wellness Center, but some worked part-time. The fitness trainers, personal trainers, massage therapists, and instructors at the Center were permitted to work at competing commercial health clubs, and the personal trainers and massage therapists could accept tips.
The responsibilities of the fitness trainers included giving tours to prospective members, conducting orientation sessions for new members, circulating on the exercise floor, and, when appropriate, taking blood pressures of people exercising. All fitness trainers were high school graduates and certified or educated in physical *309 fitness. The personal trainers were high school or college graduates and certified by national organizations. They received in-house training at the Wellness Center and were encouraged to continue their education. Fitness trainers were paid hourly. Personal trainers were paid hourly based on appointments for their services. Massage therapists were also paid hourly by appointment, as were the aerobics, swimming and other special program instructors, except the karate instructor who was an independent contractor. The karate instructor received seventy percent of fees paid by class enrollees; HMC received the other thirty percent.
The medical director of the Wellness Center was a part-time employee, whose employment contract obligated him to provide services during an average of three and one-half hours per week. None of the services was required to be performed at the Center. Generally, his services consisted of telephone conversations with the director of the Wellness Center. If a medical emergency occurred at the Center, the staff would not notify the medical director and would telephone 911 for assistance. The Center also had a medical advisory panel which, although intended to meet at least monthly, met sporadically during the years under appeal. The purpose of this panel was to provide guidance and advice on medical issues involved in the operation of the Center.
The Wellness Center was a member of the Medical Fitness Association, a national organization founded in 1991, the membership of which consisted of medically based fitness centers mostly operated by hospitals, but some commercially owned. As part of HMC’s charity care, the Center provided discounted memberships to people unable to afford the full membership fees. For the years under appeal, fewer than ten people received a charity care discount.
To become a member of the Wellness Center, an individual was required to complete a Physical Activity Readiness Questionnaire (PARQ). Many commercial fitness centers used the same or similar PARQ form. This questionnaire sought information as to the prospective member’s age, history of heart disease, diabetes, *310 high blood pressure and high cholesterol, and smoking history. If the answers as to heart disease or diabetes were affirmative, or the answers to any three of the questions as to disease history or smoking were affirmative, medical clearance was required before membership would be permitted. If the prospective member did not have a personal physician, the medical director of the Wellness Center would be requested to review the prospective member’s responses and make a recommendation as to whether he or she should be permitted to join and as to restrictions on the person’s exercise program. During the years under appeal, the medical director reviewed approximately ten PARQ forms.
If the medical director or the prospective member’s personal physician approved membership in the Wellness Center, subject to restrictions on a person’s exercise program, documentation as to the restrictions was kept on file at the Center and was available to the staff. The fitness trainers regularly present at the person’s usual exercise time became familiar with the applicable restrictions and attempted to monitor compliance. However, if a person changed exercise times, the fitness trainers at the Center during the changed exercise times might not have been familiar with the person or the applicable exercise restrictions.
Prospective members were requested to complete a standardized health risk assessment questionnaire and were offered a fitness assessment. Neither completion of the questionnaire nor the assessment was required, but most prospective members did both. In addition, the staff would request, but not require, that a prospective member complete a health logic questionnaire. This document contained questions as to body measurements, blood pressure, medical history, psychological condition, driving experience, home safety practices, consumption of alcohol, exercise and fitness experience, and eating habits.
The PARQ form was completed by a receptionist at the Wellness Center, a high school graduate, who recorded the prospective member’s responses to the questions on the form. During the years under appeal, the PARQ form required no signature or verification by the prospective member. The form was revised *311 after 2002 to require the prospective member to complete the form personally and verify that the answers were truthful. Based on the responses to the questionnaire, the receptionist would determine whether further medical review was required. If a prospective member completed the health risk assessment questionnaire, a staff fitness trainer reviewed the responses. Guests of members at the Wellness Center were not required to complete a PARQ form or have any other health risk assessment before exercising in the facility, but generally were required to sign a form releasing the Center from liability.
The Wellness Center offered occasional classes and seminars on various topics, all open to the public but marketed primarily to Center members. Topics included the following: healthy snacks, acupuncture, before and after pregnancy exercise, ballroom dancing, golf training, aromatherapy, women’s self-defense, yoga, meditation, tai chi, and ski conditioning. The medical director conducted one or two “Ask the Doctor” programs during the years under appeal. Commercial fitness centers offered many of the same classes and seminars. No member of HMC’s physical therapy staff or cardio-pulmonary rehabilitation staff, and no HMC dietitian or nutritionist, offered any class or seminar. No physician had an office or hours at the Center.
The PT Service operated from 7:30 a.m. to 8:00 p.m. Monday through Thursday, and from 7:30 a.m. to 5:00 p.m. on Friday. The Service occupied a treatment room on the second floor of the Wellness Center, and persons receiving therapy used the exercise equipment and facilities at the Center. Four pieces of equipment located outside the PT Service treatment room were intended to be used primarily, but not exclusively, by persons receiving therapy. Therapy was performed pursuant to prescriptions from physicians, which either set forth a detailed program or simply instructed the therapist to “evaluate and treat” a person’s condition. A copy of the treatment plan was sent to the physician, but no response from the physician was required. No information was communicated to the Center’s medical director concerning therapy provided by the PT Service. In a few instances, the Service offered reduced rates to those unable to afford its regular fees.
*312 During 1999, 2000, and 2001, HMC offered physical therapy services at the Hospital and at the Wellness Center. In December 2001, HMC leased physical therapy space at the Health Quest Fitness Center, a commercial health club having no other relationship with HMC and located less than one mile from the Hospital. During 2002, the outpatient physical therapy service previously located in the Hospital moved to an off-site office building, and physical therapy services continued to be provided at the PT Service and at Health Quest. HMC’s physical therapy department had a clinical coordinator who had no medical background, worked part-time, and was paid hourly. The department also had a medical director who was not present at the Subject Building and did not review treatment plans for therapy provided at the PT Service. In 1999, the PT Service provided therapy to approximately twenty-five people per week. During 2000, this increased to approximately forty people per week and continued at that level in 2001 and 2002. During the years 1999 through 2002, part-time therapists were used, some of whom also worked elsewhere, including at competitors of the PT Service. Non-members of the Wellness Center could receive physical therapy from the PT Service, and could make appointments directly with the Service.
The CP Rehab Service was open from 7:30 a.m. to 12:00 noon on Monday, Wednesday and Friday. The Service occupied an office on the first floor of the Wellness Center, and persons receiving rehabilitation used exercise equipment and facilities on the first floor of the Center. Approximately thirty-six people per year received services during each of the years 1999 through 2002, involving approximately 150 visits per month. The CP Rehab Service provided only Phase III rehabilitation services, which were physician referred but not physician supervised. Phase I rehabilitation services are inpatient services in a hospital. Phase II is a high risk short-term program using telemetry and pulse monitoring. The Center had none of these facilities. A person seeking rehabilitation services from the CP Rehab Service was not required to be a Wellness Center member but was required to go to the admissions office at the Hospital before services would begin. The CP Rehab Service prepared a treatment plan for each *313 person and submitted the plan to the person’s private physician for review and approval. No services were provided until the physician approved the plan. Periodic progress reports were sent to the physician. The rehabilitation services at the CP Rehab Service were provided by an on-premises registered nurse employed by HMC. In a few instances, the Service offered reduced rates to those unable to afford its regular fees.
HMC’s medical director of cardiac rehabilitation and medical director of pulmonary rehabilitation had their offices at the Hospital. These physicians oversaw the rehabilitation program at the CP Rehab Service, but neither was present at the Subject Building. They reviewed treatment plans and medical records for people referred to the CP Rehab Service by physicians not on the HMC staff.
The CP Rehab Service office contained a defibrillator and other emergency equipment, which the nurse was trained to use. No other staff members at the Wellness Center were trained to use this equipment. If a Wellness Center member had a medical emergency, the CP Rehab Service nurse, if present, usually would respond to the emergency but was not obligated to do so.
The Pediatric Practice existed as a private practice before acquisition by HMC in December 1997. The Practice’s offices at the Subject Building included eight examining rooms, three physician offices, a nurses’ station, laboratory area, reception area, waiting room area, and ancillary facilities. Office hours were 8:00 a.m. to 5:30 p.m., Monday through Friday. People came to and used the Pediatric Practice as they did any private pediatrician, although some may have been referred to the Practice by a physician at the Hospital. If a patient of the Practice had an after hours emergency, the patient or parent or guardian would telephone 911 and be directed to a centralized triage facility, which allocated patients among hospitals. A patient of the Pediatric Practice would not necessarily be referred to the Hospital for treatment. No outpatient pediatric facility existed or has existed at the Hospital, although there is an inpatient facility for children requiring twenty-four hour care.
*314 Under the employment agreement between HMC and each of the physicians at the Pediatric Practice, a specific annual amount of money Was allocated to the Practice and was divided among the physicians pursuant to their agreement. In addition, the physicians received a percentage of revenues in excess of specified minimum amounts.
During the years under appeal, HMC operated the Wellness Center, PT Service, CP Rehab Service, and the Pediatric Practice as members of Hospital departments. HMC prepared budgets for each, was responsible for any financial losses, and received all revenues, except to the extent that physicians at the Pediatric Practice were entitled to a percentage of revenues, and the karate instructor at the Wellness Center received a percentage of fees paid for this class. The Wellness Center and Pediatric Practice each had its own bank account, but funds deposited there were transferred to HMC’s bank account twice per month. The Wellness Center, PT Service, CP Rehab Service, and Pediatric Practice were subject to HMC’s policies and rules. Because each of these facilities and services was a member of a Hospital department, medical information as to a person using any one of these services and facilities could be shared among them and with the Hospital without the person’s specific consent.
II.
Analysis
A. General.
HMC seeks exemption from property tax for the Subject Building (exclusive of the portion leased to the cardiology practice) pursuant to N.J.S.A. 54:4-3.6, which provides in relevant part as follows:
The following property shall be exempt from taxation under this chapter: ... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; ... provided, in case of all of the foregoing, the buildings, or the lands on which they stand, or *315 the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit____The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed____
[N.J.S.A. 54:4-3.6.]
This statute establishes the following three criteria that must be satisfied to qualify for exemption: (1) the entity owning the property must be organized exclusively for the exempt purpose; (2) the property must be actually used for the exempt purpose; and (3) the operation and use of the property must not be conducted for profit. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 506, 472 A.2d 517 (1984). See also Mega Care, Inc. v. Union Tp., 15 N.J. Tax 566, 572 (Tax 1996). In deciding whether these criteria have been satisfied, a court must apply the principle of statutory interpretation generally applicable to exemption claims, namely, that “statutes granting exemptions from taxation are to be strictly construed against those seeking exemption,” but the statutory language and legislative intent should not be distorted. Paper Mill Playhouse, supra, 95 N.J. at 506-507, 472 A.2d 517. See also City of Long Branch v. Monmouth Med. Ctr., 138 N.J.Super. 524, 530-31, 351 A.2d 756 (App.Div.1976), aff'd o.b., 73 N.J. 179, 373 A.2d 651 (1977).
I will discuss first the organization of HMC, then whether the Subject Building was operated for profit during the years under appeal, and lastly, whether the Subject Building was used for hospital purposes.
B. Organization for the Exempt Purpose.
In determining whether a corporate property owner is organized exclusively for an exempt purpose, the focus is on the owner’s organizational documents, including its articles of incorporation and by-laws. Black United Fund of N.J., Inc. v. East Orange City, 17 N.J. Tax 446, 455 (Tax 1998), aff'd, 339 N.J.Super. 462, 772 A.2d 65 (App.Div.2001) (“When determining whether an entity is organized exclusively for an exempt purpose, the courts look only to the entity’s organizational documents.”). See *316 also Planned Parenthood of Bergen County, Inc. v. Hackensack City, 12 N.J. Tax 598, 610 n. 6 (Tax 1992), aff'd, 14 N.J. Tax 171 (App.Div.1993) (holding that “the term ‘organized’ in the statute refers to the entity’s organizational documents, its corporate charter”).
During the years under appeal, 2000, 2001 and 2002, and as of the relevant preceding October 1 assessment dates for each year, HMC’s certifícate of incorporation, provided as follows as to its corporate purpose:
The purposes for which this corporation is formed are charitable, including the establishment, erection, operation, support and management of a hospital and a medical and health center or institution, and related facilities, where medical and surgical diagnosis, treatment, care, and nursing, and improvement of, and benefits to, their health, will be rendered to persons of any creed, race, nationality, or color; and also including as a part thereof, medical research, the training of physicians and auxiliary personnel.
The certificate of incorporation was amended and restated as of May 3, 2001, to set forth the following corporate purpose:
(A) Hunterdon Medical Center (the “corporation”) is organized and shall be operated exclusively for charitable, scientific or educational purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 and the Regulations thereunder as they now exist or as they may hereafter be amended ..including without limitation for the purposes more particularly set forth below in this Article SECOND.
(B) More specifically, the purposes for which this corporation is formed are charitable, including the establishment, erection, operation, support and management of a hospital and a medical and health center or institution, and related facilities, where medical and surgical diagnosis, treatment, care, and nursingj and improvement of, and benefits to, their health, will be rendered to persons of any creed, race, nationality, or color; and also including as part thereof, medical research, the training of physicians and auxiliary personnel.
Defendant asserts that the foregoing language authorized charitable activities other than the operation of a hospital and, because HMC’s purposes were not limited exclusively to hospital purposes, HMC did not satisfy the organizational requirement of N.J.S.A. 54:4-3.6. A similar argument was asserted by the defendant municipality in Jersey Shore Medical Center v. Neptune Tp., 14 N.J. Tax 49 (Tax 1994). In rejecting the argument, the court stated as follows:
Although the statute requires that an entity be organized exclusively for hospital purposes, the words should not be construed literally with the result that Jersey *317 Shore’s ancillary purposes of operating a nursing school and providing complementary educational, scientific and charitable services destroy its exemption. Statutes are to be read sensibly rather than literally and the controlling legislative interest is to be presumed as consonant to reason and good discretion. Statutory interpretation that would lead to an absurd or unreasonable result is to be avoided. Thus, although it is generally said that tax exemptions are strictly construed against the taxpayer, the basic inquiry always is the legislative intent as expressed in the statute.
[Id. at 56 (citations and internal quotation marks omitted).]
HMC’s certificate of incorporation, as in effect during the years in issue, when read literally, could be construed to authorize activities other than the operation of a hospital. However, when read sensibly and reasonably, the certificate satisfies the statutory requirement that HMC be organized exclusively for hospital purposes. Although other activities are possible under the term “charitable,” the totality of the language of the purpose clause in effect for tax years 2000 and 2001, and as amended for tax year 2002, makes abundantly clear that HMC was organized to operate a hospital and ancillary facilities and services. Accordingly, I reject defendant’s contention that HMC does not qualify for exemption because it was not organized exclusively for hospital purposes.
C. Not-For-Profit Purpose.
The statutory requirement that an entity claiming an exemption not be operated for a profit-making purpose relates both to the owner of the property and to the operations conducted in the property. That HMC, in general, is not operated for profit is established by its organizational documents and its use of the revenues it receives to operate and improve the Hospital. The issue remains, however, as to whether HMC’s operations in the Subject Building were conducted for a profit-making purpose. Defendant contends that two of the facilities at the Subject Building, the Wellness Center and the Pediatric Practice, were conducted for profit. As to the Wellness Center, defendant argues that the fee structure was comparable to, and competitive with, the fee structures of private health clubs in the area, and cites the participation of the Center in a percentage of fees received from the karate classes offered at the facility. As to the *318 Pediatric Practice, defendant relies on the provisions of the employment agreements with the physicians, under which they split with HMC the net revenues of the Practice in addition to receiving the base compensation specified in the agreements. Defendant asserts that, by providing for this split, the employment agreements encouraged the physicians to generate profits in which they and HMC had a percentage interest.
In Paper Mill Playhouse v. Millburn Tp., supra, our Supreme Court held that an entity’s realization of net income from its operations does not necessarily mean that the entity is conducted for profit.
Our cases require a pragmatic inquiry into profitability. The decisions reveal a realistic common sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided.
A crucial factor is where the profit goes. As the Appellate Division stated [in Trenton v. N.J. Div. of Tax Appeals, 65 N.J.Super. 1, 12, 166 A.2d 777 (App.Div. 1960)], “[i]f the college does show operational surpluses for some years, the crucial inquiry is, “Who gets the money?’ If we can trace it into someone’s personal pocket * * * the college is not entitled to tax exemption * * *.”
[ 95 N.J. at 521-22, 472 A.2d 517 (citation omitted). ]
The Tax Court in Jersey Shore Medical Center v. Neptune Tp., supra, found that a 60/40 profit split between the hospital and the operator of the coffee shop
makes clear that both parties contemplate making a profit, and there is nothing in the other terms of the agreement to suggest that a profit is impossible. The use of the property is thus commercial in nature and not exempt.
... While competitive prices and actual profits or losses may constitute evidence of a particular purpose, they are not conclusive.
... The decisive fact in this case is the profit-making purpose as evidenced by the sharing of any pecuniary profits between the hospital and the coffee shop operator.
[ 14 N.J. Tax at 62-63. ]
The proofs presented by HMC demonstrate that all revenues from the Wellness Center were revenues of HMC and were used for HMC’s purchases of equipment and other improvements necessary at the Hospital. I conclude, therefore, that the Wellness Center was not conducted with the intention of making a profit. That the Center generated revenue in excess of expenses, does not demonstrate, in itself, a profit-making purpose. That the fee structure of the Wellness Center was competitive with similar *319 facilities in the area also does not demonstrate, in itself, a profit-making purpose.
The proofs as to profit-making purpose were different for the Pediatric Practice, where revenues were divided between HMC and the physicians. Under their employment agreements, the physicians received a specified base compensation coupled with a short term incentive plan and a separate long term incentive plan. The short term incentive plan provided that the physicians would receive “actual net revenue” in excess of specified amounts for each of the years under appeal, with an overall annual cap of $200,000. The cap amount equaled approximately ten percent of aggregate base compensation for each year under appeal. The long term incentive plan provided that fifty percent of the “Debt Free Net Cash Flow” in excess of specified annual amounts, ranging from $172,778 in 1999 to $348,528 in 2002, would be added to the base compensation for the physicians.
The parties did not establish the total compensation of the physicians in the Pediatric Practice for each year under appeal. However, because the short term incentive plan contemplated “net revenue” in excess of approximately $5,000,000, I infer that the dollar amounts involved in the long term incentive plan could be substantial. Consequently, for the Pediatric Practice, a portion of surplus revenues can be traced to “someone’s personal pocket.” Paper Mill Playhouse, supra, 95 N.J. at 522, 472 A.2d 517. Under the principles articulated in Paper Mill Playhouse and in Jersey Shore Medical Center discussed above, this diversion of part of the surplus revenues to the physicians characterized the Practice as operated for a profit-making purpose. That all revenues from the Pediatric Practice were transmitted to HMC does not neutralize the significance of the Practice’s profit-making orientation. See Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 216, 172 A.2d 420 (1961) (holding that publication of books other than scholarly books, in order to realize profits used to offset losses incurred in publishing scholarly books, caused the operation of the Princeton University Press to “take[] on the nature of a commercial enterprise”).
*320 Based on the preceding analysis, I conclude that the portion of the Subject Building occupied by the Pediatric Practice did not qualify for exemption because of the profit-making purpose in the operation of the Practice. As discussed below, this portion of the Building also failed to qualify because the Practice primarily served members of the public and not Hospital patients.
D. Use For The Exempt Purpose.
The issue remaining is that of whether HMC’s use of the Subject Building was for hospital purposes as required under the second item of the three-part test articulated in Paper Mill Playhouse. HMC contends that it satisfied the use requirement because its facilities and services in the Subject Building constituted part of the continuum of care HMC provided, including services at the Hospital and at the Wellness Center, PT Service, CP Rehab Service, and Pediatric Practice. In support of this contention, HMC presented fact witnesses who testified as to the integration of the subject facilities and services with the Hospital in the following respects:
A. all facilities were operated as members of departments of the Hospital;
B. all monies collected for any services provided at these facilities were transferred to HMC’s bank account, even if deposited in separate accounts on an interim basis;
C. all budgeting and financial planning for each of the facilities was done by HMC as part of its general hospital planning, and HMC was responsible for any financial shortfalls or losses;
D. because each of the facilities constituted a member of a Hospital department, medical information could be transferred from and to the Hospital and between and among the facilities without requiring separate consent; and
E. all of the facilities were used to enable HMC to fulfill its mission as a hospital.
HMC also presented the testimony of an expert who opined that the Wellness Center constituted a medically based fitness center and was an integral part of the continuum of care model appropriate for hospitals during the years under appeal. This witness described medically based fitness centers as having the following characteristics:
Medically based fitness centers identify and utilize an individual’s personal and unique health profile to design a dynamic, safe and medically supervised fitness program to improve the health status of each individual, and thereby improve the *321 health status of the population served. This program is used to help the individual achieve the desired level of health, prevent disease, or to integrate the inclusion of exercise as an adjunct treatment for his/her chronic disease based on recommendations of health professionals. The availability of seamless referrals across the continuum of care assists in creating a clinically integrated system of care that serves an entire population including the apparently healthy, asymptomatic person through the patient recovering from a major acute disease or injury to managing chronic conditions.
The witness explained that the Wellness Center is part of the new model of a medical care system. Under the traditional model, hospital care was primarily related to birth and then “sick care,” including ambulatory care, acute care, post-acute care (otherwise known as rehabilitation), and palliative care. The new model recognizes “sick care” as representing only approximately twenty percent of a hospital’s continuum of care responsibilities. The remaining eighty percent relates to “managing the population’s health or its health status.” This includes health education, disease management, on-going health screenings, monitoring of health risks, and lifestyle management to encourage and facilitate healthy lifestyle choices. Medically based fitness centers are part of this new model. The witness described the Wellness Center as satisfying the following criteria for a medically based fitness center: ownership by a hospital; a medical director and medical advisory board; evidence of extension of the health care delivery system; a mission to serve as part of a comprehensive approach to medical care; the presence of educational programs; free or discounted services offered to member patients; a hospital-qualified staff; the presence of integrated clinical departments; and an appropriate level of service.
HMC offered extensive proofs as to the frequency of communications between the director of the Wellness Center and personnel at the Hospital and with the Center’s medical director, and as to the Center’s integration into the financial and administrative services of the Hospital. HMC asserts that having the PT Service and CP Rehab Service located in the Wellness Center contributed to the Center’s integration with the Hospital because these services used not only specific areas of the Center but also much of the equipment and the facilities available to members.
*322 Defendant describes the integration of the Wellness Center with the operations of the Hospital and the medical orientation of the Wellness Center as more hypothetical than real and asserts that, in reality, the Wellness Center, PT Service, CP Rehab Service, and Pediatric Practice simply competed in the marketplace for business with commercially owned and operated health clubs, therapy and rehabilitation providers, and pediatricians, respectively, in the vicinity. Defendant notes that the PT Service and CP Rehab Service occupied very limited areas in the Wellness Center devoted exclusively to their use, and that any equipment they used was also available to general members of the Center who constituted the primary users of all of its equipment and facilities.
N.J.S.A. 54:4-3.6 does not require that, in order to qualify for exemption, a facility must be used as a hospital. The statute requires that the facility be used for “hospital purposes.” In City of Long Branch v. Monmouth Medical Center, supra, 138 N.J.Super. 524, 351 A.2d 756, the court applied this standard to several hospital-owned buildings. One building contained apartments used exclusively by medical residents, interns and nurses on the hospital staff. Another was a three-story office building, approximately one-half of which was occupied and used as private physicians’ offices, a third building was an office building, most of which was rented to physicians for conduct of their private practices, and a fourth building was used as a psychiatric, medical, and surgical clinic by the hospital with a portion of the building area leased to a retail pharmacy. The court articulated the test to be employed in determining whether each facility was used for hospital purposes as “whether the property is ‘reasonably necessary’ for such purposes.” Id. at 532, 351 A.2d 756. In holding that the apartment building qualified for exemption, the court stated:
The furnishing of housing facilities to resident physicians, interns and nurses on the hospital staff is reasonably necessary for the proper and efficient operation of the hospital____ The evidence established that the substantially lower rentals charged by the Center to the resident physicians, interns and nurses served as a subsidy to attract qualified people to [the hospital’s] staff. Furthermore, it is obvious that by providing housing facilities for its resident physicians, interns and nurses in or near the hospital, the Center is better able to function properly and efficiently on a 24-hour basis.
*323 [Id. at 533, 351 A.2d 756.]
In denying the exemption to the office buildings, the court stated:
[E Ixemption from taxation for these buildings cannot be granted because it may be convenient for the Center to have staff physicians maintain their private offices in close proximity to the hospital, or because these physicians may perform some of their hospital duties in their private offices. Convenience is not the test; the test is reasonable necessity for hospital purposes, and the use of these buildings for private professional offices is not reasonably necessary for the Center’s hospital purposes.
[Id. at 535, 351 A.2d 756.]
The Appellate Division denied the exemption to the clinic building because N.J.S.A. 54:4-3.6, as then in effect, required that the entire building be used exclusively for hospital purposes. Because a portion of the building was rented to a retail pharmacy, the building was not used exclusively for hospital purposes.
The “reasonably necessary” standard articulated in Monmouth Medical Center was adopted and applied by the Tax Court in Jersey Shore Medical Center v. Neptune Tp., supra, 14 N.J. Tax 49, in determining whether a hospital-owned coffee shop, cafeteria, and child care center were entitled to exemption as being used for hospital purposes. The court stated that “the accepted test in New Jersey for determining whether property is used in the work of an entity organized for an exempt purpose is whether the property is ‘reasonably necessary’ for such purpose.” Id. at 60 (citations omitted). In granting an exemption to the child care center, the court noted that “[t]he essence of a hospital is 24-hour continuous medical and nursing care. Jersey Shore’s child care center furthers that essential function.” Id. at 68 (citations omitted).
The combination of these factors — limitation of enrollment to children of hospital employees, location on the hospital premises, lengthy hours of operation, wiBingness to admit infants as young as eight weeks, and existence of fa] mildly-ill room — establish that the child care center exists to further the hospital’s staffing needs and its 24-hour continuous care operation. The presence of three children of non-hospital employees on a grandfathered basis out of approximately 250 enrolled children is de minimis and does not indicate a use for non-hospital purposes.
[Id. at 69.]
The court further noted that, if the child care center had been operated by a for-profit corporation, it might have been taxable, while the same operation when conducted on a non-profit basis *324 qualified for tax exemption. “The same is true of laundry services, accounting services, residential facilities for essential staff, and parking garages. If operated in conjunction with a functioning hospital, all these services may become exempt uses.” Ibid.
A building can be reasonably necessary for the operation of a hospital even if located a distance from the hospital. In Perth Amboy General Hospital v. City of Perth Amboy, 176 N.J.Super. 307, 422 A.2d 1331 (App.Div.1980), the Appellate Division held that condominium units located a one and one-half miles from a hospital, and occupied by hospital medical residents and interns and their families, were entitled to exemption as being used for a hospital purpose. The court specifically noted that “the distance separating the condominium from the hospital is not sufficient by itself to deprive the condominium of a ‘hospital purpose.’ ” Id. at 311, 422 A.2d 1331.
In City of New Brunswick v. Rutgers Community Health Plan, Inc. 7 N.J. Tax 491 (Tax 1985), the issue was not whether a facility ancillary to and supportive of a hospital’s medical services qualified for a hospital purposes exemption, but whether a health center owned by a not-for-profit health maintenance organization qualified for the exemption. The facility had equipment sufficient to provide “a full range of diagnostic services including x-rays and laboratory testing in conjunction with medical examinations in all specialty areas____” Id. at 497. It was open “from 8:30 a.m. to 9:30 p.m. every weekday, all day Saturday and Sunday afternoon.” Ibid. Rutgers Community Health Plan (“RCHP”) argued that the facility provided services equivalent to those reasonably necessary for the functioning of a hospital and, therefore, it qualified for a hospital purposes exemption.
The Tax Court denied the exemption because RCHP did not provide its services for purposes of furthering the goals of a hospital and was not sufficiently integrated with the hospitals with which it was affiliated, or to which it referred patients, to support a conclusion that the health center facilitated the goals and purposes of those hospitals. In reaching this conclusion, the court found that “implicit within the cited definition of the word ‘hospital’ is the requirement for continuous ongoing care,” id. at 500, *325 and described “24-hour continuous care” as a “distinguishing feature” of a hospital. Id. at 504. The essence of the court’s analysis in denying the exemption was the following:
The focus in cases applying the hospital purposes exemption to nonhospital facilities is on the extent of the integration of the tax exempt hospital with the facility for which exemption is sought or on the association between the two.
... [EJven where the function of the facility involved is to provide hospital-type medical or health care services, the facility cannot exist for hospital purposes unless its services are reasonably necessary to and thereby fulfill the purposes of a hospital.
[Id. at 505-06.]
The court in Intercare Health Systems, Inc. v. Cedar Grove Tp., 11 N.J. Tax 423 (Tax 1990), aff'd, 12 N.J. Tax 273 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 369 (1992), adopted an approach similar to that in Rutgers Community Health Plan. The issue was whether a nursing home qualified for a hospital purposes exemption. The nursing home was not owned or operated by a hospital but had transfer agreements with ten community hospitals, one of which was owned by the same non-profit corporation that owned the operator of the nursing home. The transfer agreements provided for “the efficient and expeditious transfer of patients and information” between the nursing home and the hospitals. Id. at 426. The defendant did not dispute that the nursing home provided “a medical service to patients who are transferred from hospitals and that an expeditious patient discharge permits a hospital to make more efficient use of its facilities.” Id. at 427. The court articulated the test used to determine whether the nursing home qualified for exemption as whether the operation “was sufficiently integrated with a hospital so that [the] building’s use was an integral part of operating a functioning hospital,” id. at 431, and concluded that the relationships between the nursing home and the various hospitals were “cooperative, rather than integral.” Id. at 432. Therefore, the nursing home facility did not qualify for exemption.
Hillcrest Health Service System, Inc. v. Hackensack City, 18 N.J. Tax 38 (Tax 1998), involved a claim of a hospital purposes exemption by the owner of a building used in connection with the *326 operations of a hospital owned by a different corporation. The Tax Court held that, because the certificate of incorporation of the entity owning the building did not restrict its operations to support of the hospital, the property did not qualify for exemption. The court also discussed briefly whether a fitness center located in the building would qualify for exemption, if the building were owned by the hospital. The fitness center occupied approximately 4850 square feet and contained a variety of exercise equipment. It was used by members of the medical and management staffs of the hospital, employees of the hospital, and certain outpatients participating in a cardiac rehabilitation program housed in the same building.
In addition, however, the record discloses that persons having no relation to the hospital may for a fee use the fitness center. The intensity of use by members of the public is not developed on the record. It would not appear, however, that use statistics are essential to demonstrate that an exercise facility open to the general public is used more than incidentally for purposes other than the operation of the hospital. The portion of the building used for the fitness center would not therefore be qualified for exemption.
[Id. at 49.]
The foregoing decisions granted hospital purposes exemptions to facilities owned by hospitals and used for purposes ancillary to and supportive of the hospitals’ core function of 24-hour continuous acute care, but denied exemptions to facilities not owned by hospitals and claiming that their independent operations served a hospital purpose. None of the decisions addressed whether the hospital purposes exemption applies to a facility with the following characteristics: (1) ownership and operation by a hospital; (2) a location distant from the main hospital campus; (3) not used for a purpose ancillary to and supportive of the hospital’s core function; and (4) used as part of the hospital’s continuum of care and its mission to enhance and improve the general health status of the population in the local area.
The “continuum of care” concept is relatively new in the operation of hospitals and involves a material expansion of hospital services from the 24-hour continuous acute care described in Rutgers Community Health Plan, supra, 7 N.J. Tax at 504, and in Jersey Shore Medical Center, supra, 14 N.J. Tax at 68. The *327 expanded services comprise educational programs, “wellness” programs addressing fitness and dietary concerns, and other “lifestyle” services and programs provided at the hospital or in other locations. Here, those services include the Wellness Center, the PT Service, the CP Rehab Service, and the Pediatric Practice at the Subject Building.
Accompanying hospitals’ expansion of services has been an expansion of their definition of their mission and of what is “reasonably necessary” to fulfill that mission. HMC’s president and chief executive officer described its concept of its mission as follows:
[T]o create an integrated model of healthcare to attempt to develop a comprehensive range of services from preventive to home that would provide a seamless delivery system, an easy way for accessing care and an easy way of delivering care to the patient. The focus is primarily a patient focused agenda one where an attempt to provide convenience as well as — as a cure and compassion [are] part of our philosophy.
HMC’s expert witness defined a hospital as “a site of care that provides, at a minimum 24 hour inpatient care and outpatient programs and services that meet the needs of the population served by that particular entity.” He defined a hospital purpose as “any activity or service that furthers the mission of that hospital.” Both witnesses acknowledged that the definition of a hospital and, therefore, the definition of hospital purposes have been evolving and that, in general, the direction and extent of the evolution have been determined by the hospitals themselves.
The effort by hospitals to self-define their mission is reminiscent of the following conversation included in Lewis Carroll’s Through the Looking Glass.
I don’t know what you mean by “glory,” Alice said.
Humpty Dumpty smiled contemptuously. “Of course you don’t — till I tell you.” ... “When I use a word,” Humpty Dumpty said in rather a scornful tone, “it means just what I choose it to mean — neither more nor less.”
[Lewis Carroll, Through the Looking Glass 58 (Whittlesey House ed.).]
In an attempt to explore what limits, if any, applied to what hospitals choose the terms hospital and hospital purposes to mean, I asked several of HMC’s witnesses to describe the distinction between the Wellness Center and a hypothetical gourmet restau *328 rant owned by HMC at which a Hospital nutritionist or dietitian was present to give advice as to appropriate menu selections. The witnesses agreed that food and diet contributed to health, as did exercise, but sought to distinguish the gourmet restaurant example from the Wellness Center on the basis that the restaurant patron would not be a regular diner at the restaurant and would not be bound by the recommendations of the nutritionist or dietitian. However, a member of the Wellness Center could exercise regularly or only sporadically, just as a person could be a regular or sporadic patron of the gourmet restaurant. Similarly, if the exercise physiologist or a fitness trainer at the Wellness Center suggested to a member that certain exercise levels should not be exceeded or that certain exercises should not be undertaken, the member could ignore that advice, just as the gourmet restaurant patron could ignore the advice of HMC’s nutritionist or dietitian. The attempts by HMC’s witnesses to distinguish the gourmet restaurant from the Wellness Center were unconvincing.
The gourmet restaurant example suggests the open-ended nature of the concept of hospital purposes asserted by HMC in these proceedings. For example, the concept possibly could include a supermarket owned and operated by a hospital and selling only food products approved by its dietitian or nutritionist[1] or a hospital-owned massage parlor providing services only to those working at high levels of stress. These examples may seem fanciful at this time, but, as HMC’s expert witness acknowledged, the concept of a wellness center as a hospital purpose was equally fanciful not too many years ago.
*329 The expansion of hospitals’ definition of their role in health care and the expansion of their health-related activities affect the analysis of a hospital purposes exemption claim under N.J.S.A. 54:4-3.6 in two respects. First, for purposes of that analysis, the definition of a hospital as a 24-hour continuous acute care facility set forth in Rutgers Community Health Plan, supra, 7 N.J. Tax at 504, and Jersey Shore Medical Center, supra, 14 N.J. Tax at 68, no longer is accurate or adequate. Second, the “reasonably necessary” standard no longer provides a workable basis for determining qualification for the exemption because, under that standard, a hospital can argue, as does HMC, that any off-campus facility used for continuum of care health-related purposes is reasonably necessary to its operations, and a taxing district can argue, as does defendant, that no off-campus facility is reasonably necessary because the hospital can continue to function and provide its core acute care services without the facility. The testimony of HMC’s Vice President for Physician Practice Management illustrated the difficulty of resolving these arguments under the reasonably necessary test. He described the portion of the Subject Building occupied by the Pediatric Practice as part of the Hospital and fulfilling a Hospital purpose, but conceded that, if the Practice were not located in the Subject Building, the impact on patients in the area would be greater than the impact on the Hospital’s operations.
The preceding discussion demonstrates the necessity for modification of the reasonably necessary standard and use of a new analytical approach in order to distinguish facilities serving hospital purposes from facilities merely housing health-related activities. Decisions in Tennessee and Indiana suggest some considerations relevant to a new approach. In Middle Tennessee Medical Center v. Assessment Appeals Commission, 1994 WL 32584 at *1 (Tenn.Ct.App.1994), the plaintiff hospital claimed a property tax exemption with respect to a wellness center owned by it and located in a building separate from the hospital. The center was quite similar in its operations and facilities to the Wellness Center, and the arguments made in support of the exemption claim were quite similar to those advanced by HMC.
*330 Counsel for the Medical Center argues that the entire menu of programs offered by the PACE Center is expressive of a growing trend in healthcare to look towards prevention rather than waiting until a patient requires treatment. We are told that this “holistic” approach justifies the extension of the charitable tax exemption to the entire property occupied by the PACE Center.
[Id. at *4.]
The court held that the PACE Center qualified for exemption only to the extent (fifteen percent of total usage) that its facilities were used, at the direction of hospital physicians, by hospital cardiac patients, hospital sports medicine patients, and individuals enrolled in hospital chemical dependency programs, id. at *5, and rejected the remaining eighty-five percent of the exemption claim, which related to use of the facility by persons not under a doctor’s care and exercising for their own purposes. The court noted that competition with for-profit businesses, although not dispositive, was a relevant consideration, and concluded as follows:
We feel it would be a misuse of the tax exemption granted to charitable hospitals if every revenue-generating venture they embarked upon automatically benefited from the exemption, so long as that venture could be characterized as in some way promoting health. We are conscious, however, that medicine is a rapidly changing discipline, and that hospitals must be responsive to new developments in 'medical practice. We therefore will not attempt to create some hard and fast rule to fix forever the tax status of wellness centers owned by charitable hospitals. Each case must stand on its own facts.
[Id. at *5.]
The Tax Court of Indiana, in Indianapolis Osteopathic Hospital, Inc. v. Department of Local Government Finance, 818 N.E.2 d 1009 (Ind. Tax Ct.2004), quoted and adopted the Tennessee court’s approach in denying exemption to a fitness center. The center occupied approximately three quarters of a building located on a hospital campus, and the balance of the building was a medical pavilion used in part by hospital departments. The hospital had a 70% ownership interest in the owner of the fitness center (itself a not-for-profit corporation) and owned the land on which the center was located. The fitness center was used 41% of the time to provide “outpatient rehabilitation services, research, and community education,” and 59% of the time as “a community-oriented fitness facility.” Id. at 1012. The court held that the center failed to satisfy the Indiana statutory requirement that, in order to *331 qualify for exemption, property must be “predominantly used or occupied” for the exempt purpose. Id. at 1015.
The foregoing decisions interpreted Tennessee and Indiana statutes providing tax exemptions for “charitable” uses. Neither state permitted a specific “hospital purposes” exemption. Although the statutory basis for the decisions differs significantly from the statutory basis for HMC’s exemption claim, the facts before the courts were similar to those presented by HMC. Consequently, the Tennessee and Indiana decisions, particularly in their focus on the significance of usage by members of the general public, are useful in analyzing the hospital purposes exemption under N.J.S.A. 54:4-3.6.[2] The New Jersey Tax Court incorporated the same focus in its comment in Hillcrest Health Service System, Inc. v. Hackensack City, supra, 18 N.J. Tax at 49, that the availability of a fitness center for use by the general public precluded qualification for a hospital purposes exemption.
Hillcrest Health Service System and the other New Jersey decisions discussed above, together with the Tennessee and Indiana decisions, suggest an analytical framework for isolating off-campus hospital facilities qualifying for a hospital purposes *332 exemption under N.J.S.A. 54:4-3.6 from the wide variety of facilities that HMC and other hospitals operated during the years under appeal and will continue to operate in the future. This framework (the “Analytical Framework”) consists of the following three components:
1. the nature and extent of the integration between the hospital and the subject facility. The greater the integration the more likely it is that a facility is serving a hospital purpose. In applying this component, the distance of the facility from the hospital campus must be considered. In Perth Amboy General Hospital v. City of Perth Amboy, supra, 176 N.J.Super. 307, 422 A.2d 1331, the location of the condominium units in issue, one and one-half miles from the hospital, did not preclude exemption. However, distance alone may suggest a lack of integration with a hospital;
2. the extent to which the activity conducted in the facility is under the control or supervision of the hospital medical staff. The lesser the amount of supervision, the more likely it is that the activity is not serving a hospital purpose; and
3. whether the facility serves primarily hospital patients or primarily members of the general public. For purposes of this determination, a person generally should not be deemed a hospital patient merely as a result of using the facility. For example, as acknowledged by HMC’s president, a member of the general public did not become a patient of the Hospital by enrolling as a Wellness Center member, and an individual using the Pediatric Practice became a patient of the Practice but not a patient of the Hospital. Under some circumstances, however, a person using a hospital-owned and operated off-campus facility could become a hospital patient by virtue of that use (see the discussion below concerning the CP Rehab Service).[3]
*333 Two additional considerations should be taken into account in applying this third component of the Analytical Framework.- The first relates to the extent to which the hospital facility competes with commercial or privately owned-facilities in the area. Competition in itself does not provide a basis to deny an exemption. However, the existence of competition with private facilities should not be totally ignored.
The second additional consideration relates to whether an exemption can be granted in proportion to the percentage of use by hospital patients of a specific facility within a building. As discussed above, the Tennessee court granted an exemption in proportion to the use by hospital patients of the hospital-owned wellness center in issue. The Indiana court, however, analyzed usage by hospital patients only to determine the predominant use of a hospital-owned wellness center, and held that predominant use by members of the general public disqualified the entire center from exemption. Our Appellate Division used the “predominant use” standard in determining whether a hospital-owned apartment building, used primarily to house hospital medical personnel, qualified for a hospital purposes exemption, City of Long Branch v. Monmouth Medical Center, supra, 138 N.J.Super, at 533, 351 A.2d 756, and the Tax Court used the standard in discussing the significance of public use of a hospital-owned fitness center. Hillcrest Health Service System, supra, 18 N.J. Tax at 49. See also Pingry Corp. v. Hillside Tp., 46 N.J. 457, 463-64, 217 A.2d 868 (1966) (granting an exemption to faculty housing where the landlord-tenant relationship between the school and the faculty members was secondary to “the primary purpose of providing the housing for the faculty”).
I conclude that the predominant use standard should be incorporated into the third component of the Analytical Framework, not in order to apportion the tax exemption for a particular facility, such as the Wellness Center, based on percentage of use for hospital purposes, but in order to determine whether or not the facility, in its entirety, qualifies for exemption. Under the express language of N.J.S.A 54:4-3.6, the hospital purposes exemption may be granted to a portion of a building, but the statute has not been, and should not be, interpreted to permit the granting of an exemption in proportion to the frequency of use of a particular space for hospital purposes. Three practical considerations support this conclusion. First, a taxpayer may not maintain reliable records as to usage percentages. Second, assessors have no means to require taxpayers to produce records as to usage. Under N.J.S.A. 54:4-34, assessors may request financial information as to income-producing properties, but the statute limits the request to income information. Third, assessors have no adequate means to make independent determinations of frequency of use based on information from the market.
I now will apply the Analytical Framework to resolve HMC’s hospital purposes exemption claim as to the areas of the Subject Building used by the Wellness Center, PT Service, CP Rehab Service, and Pediatric Practice, respectively.
*334 HMC contends that the Wellness Center qualified for exemption because it was a medically based facility, was integrated with the Hospital, performed an important function in the continuum of care offered by HMC, and fulfilled part of the Hospital’s mission to promote wellness as well as to treat illness. I reject this claim for exemption for the following reasons. I conclude that, as to components one (integration with the Hospital) and two (supervision by the Hospital medical staff) of the Analytical Framework, the Center was owned by, and integrated administratively with, the Hospital, but there was no integration of the care provided at the Hospital with the activities and programs at the Center, and the Center and its operations received virtually no supervision by the medical staff at the Hospital. As to component three (extent of use by the general public), HMC did not dispute that the vast majority of the members at the Wellness Center were from the general public simply seeking an exercise facility and not seeking a continuation of either inpatient or outpatient care or services provided at the Hospital.
The Wellness Center had a medical director, but, under the express provisions of his employment contract, he was obligated to “devote an average of three and one half hours per week” to the Center. Fulfillment of this obligation did not require his physical presence at the Center and was accomplished almost exclusively by telephone conversations. The contract specified, as one of the medical director’s responsibilities, the offering of “ ‘Ask the Doctor’ or other lecture/educational program forums on a monthly basis for the members and patients of the Center.” The proofs established that the medical director offered only one or two such programs during the years under appeal. The contract also provided that “the [medical director] shall at all times be and remain in an independent contractor relationship with the Hospital, and the Physician shall not hold himself out as an employee of the Hospital or the Center.”
Testimony by the medical director demonstrated that, although he had some involvement in the initial set up of the Wellness Center preceding the years under appeal, his participation and involvement was minimal after operations commenced. He was *335 rarely, if ever, physically present at the Center except for sporadic meetings of the medical advisory panel, even though his office was less than one-half mile away. During the three years under appeal, he reviewed approximately ten PARQ forms of persons not having a private physician who were seeking membership in the Wellness Center. Although the medical director described himself as an advocate for the Center and its function as part of a continuum of care for Hospital patients, minutes of meetings of the Hospital board of trustees reflected that he attended only one of five trustee meetings during 1995 through 1997, when planning for the Wellness Center was discussed.
The Wellness Center’s medical advisory panel had similarly infrequent involvement in operations and programs and provided minimal medical input. Minutes of the meetings of the panel indicated that, as early as October of 1998, attendance “has been quite scarse [sic] lately.” The November 1998 minutes reflected that members of the panel would be contacted by telephone to attempt to ensure their attendance at meetings. Only two of the six or seven panel members attended the September 1999 and April 2001 meetings. An agenda item for the May 2, 2000 meeting (for which attendance was not recorded) was the changing of meeting times in order to “encourage better attendance or get new members who make commitment [sic] to come to meetings.” The topics discussed at the medical advisory panel meetings, as shown in the minutes, rarely involved medical issues but generally dealt with membership retention, usage, and scheduling of programs having only a tangential relationship to the services provided at the Hospital.
The preceding discussion demonstrates that no member of the Hospital medical staff, including the medical director and medical advisory panel, supervised or meaningfully participated in the operation of the Wellness Center. As a result, integration of the Wellness Center into the medical operations of the Hospital was minimal.
The divergence between the operations of the Hospital and the Wellness Center was reflected in the medical consent form sent to *336 physicians by the Wellness Center when their consent was required for exercise by a prospective member. The form contained the following statement: “Please be advised that this is not a medically monitored facility, however, degreed and certified fitness trainers are readily available.” The Hospital surely would not describe itself as “not a medically monitored facility.” The divergence also was reflected in notes to HMC’s financial statements for the years under appeal that described the Hospital as a “not-for-profit acute care medical center. The Medical Center provides inpatient, outpatient, and emergency care services for the residents of Hunterdon County and surrounding areas.” The operations at the Wellness Center did not fit this definition.
A comparison of (1) the article in the Spring 2001 issue of “Advances,” the Hunterdon Healthcare System’s periodical magazine, concerning the Hospital’s emergency care services, with (2) the discussions of the Center’s medical advisory panel concerning purchase of an automatic external defibrillator provides additional insight into the operational distinction between the Hospital and the Wellness Center. The article extolled the “advanced technology” available at the Hospital’s Emergency Department to treat persons suffering heart attacks. The discussions at the Wellness Center’s medical advisory panel meetings in April 2001 and September 2001, as recorded in the minutes, reflected a very different level of concern about cardiac emergencies. The panel recognized that Wellness Center members assumed that, as a hospital based facility, “we are current [with] latest technology” and “would have the lates [sic] strategies for emergency care available at our site,” but, surprisingly, decided to postpone acquisition of a defibrillator and possibly wait until acquisition was required by law. By the September 2001 meeting, legislation was “in the works,” but the panel elected to speak with its attorney “to see if we should act now or wait.” No defibrillator had been acquired as of the end of 2002.
As described above, HMC presented the testimony of an expert witness relating to the criteria for establishing a medically based fitness center. HMC argues that the Wellness Center conformed to the witness’s definition. Even the witness, however, did not *337 conclude unequivocally that the Center had satisfied all of the requirements for a medically based fitness center. When asked whether the Wellness Center was such a facility, he stated: “They are still working on it, but ... they are pretty close.” Even that testimony related to a date after the relevant assessing dates in this appeal.
The witness acknowledged that commercial health clubs could satisfy the definition of a medically based fitness center, thus suggesting that satisfying the definition is not equivalent to functioning for hospital purposes. Consequently, even if the Center constituted a medically based fitness center, this factor alone would be insufficient to establish qualification for exemption under the Analytical Framework.
HMC’s argument that, because the services provided at the Wellness Center promoted health, they fulfilled a hospital purpose improperly conflates the concept of hospital purpose with any service or activity which has a health benefit. The exemption under N.J.S.A. 54:4-3.6 is available not to any facility providing health care or in which health-promoting activity takes place, but only to a facility used for hospital purposes. The term “health care facility” is defined in N.J.S.A. 26:2H-2, a provision of the Health Care Facilities Planning Act, as follows:
[T]he facility or institution whether public or private, engaged principally in providing services for health maintenance organizations, diagnosis or treatment of human disease, pain, injury, deformity or physical condition, including, but not limited to, a general hospital, special hospital, mental hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skill nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensai’y, home health care agency, residential health care facility and bioanalytic laboratory ... or central services facility serving one or more such institutions____
[N.J.S.A 26:2H-2(a).]
Under this definition, a hospital is only one type of health care facility.
N.J.S.A. 54:4-3.6 and its predecessors have included a hospital purposes exemption since the nineteenth century. In enacting the above definition of a health care facility in 1971, L. 1971, c. 136, § 2, the Legislature did not substitute “health care purposes” for *338 “hospital purposes” in N.J.S.A. 54:4-3.6. Because the Legislature is deemed “thoroughly conversant with its own legislation,” Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969), this failure to modify the hospital purposes exemption indicates a legislative intent that “hospital purposes” should be interpreted as a more limited concept than “health care purposes.” The distinction between hospital purposes and health care purposes is confirmed by N.J.S.A 26:2H-12.8, which sets forth a bill of rights applicable only to anyone “admitted to a general hospital as licensed by the State Department of Health and Senior Services.” The rights do not apply to other health care facilities.
Based on the preceding discussion, I conclude that the Wellness Center did not qualify for a hospital purposes exemption under N.J.S.A. 54:4-3.6.
I turn now to the PT Service located within the Wellness Center. During the years under appeal, a small portion of the second floor area of the Center was used exclusively as a physical therapy treatment room. Four items of equipment outside this area were intended to be used primarily by those receiving physical therapy, but also were available for use by all members of the Wellness Center. TUI other areas and equipment in the Wellness Center used by the PT Service were used primarily by the general members of the Center, with usage by people receiving physical therapy constituting a very small percentage of total usage. Anyone from the general public having an appropriate prescription from a physician could obtain therapy from the PT Service. The prescription could simply instruct the therapist to treat the condition without specifying or recommending a particular form or type of therapy. No member of the Hospital’s medical staff reviewed or supervised the therapy provided. The therapy staff consisted exclusively of non-physicians.
Under the Analytical Framework, the area of the Subject Building used exclusively by the PT Service did not qualify for exemption during the years under appeal. As to the first two components of the Framework, the Service was integrated administratively with the Hospital and operated as part of the Hospital’s *339 physical therapy department, but was not integrated medically and received no meaningful supervision by the Hospital medical staff. As to the third component, HMC failed to establish that the PT Service served primarily Hospital patients who were referred to the Service for continuation of treatment.
Because the area used exclusively by the PT Service did not qualify for exemption, and because usage by the Service of Wellness Center facilities and equipment constituted a small percentage of total usage, the presence of the PT Service in the Wellness Center did not transform the Center into an exempt facility.
The CP Rehab Service office was located on the first floor of the Wellness Center. None of the equipment used for the rehabilitation services was dedicated to those services, but was generally available to all members of the Center. Usage of the Wellness Center equipment and swimming pool by persons undergoing rehabilitation constituted only a very small proportion of overall usage.
The Service was integrated administratively and medically with the Hospital and was supervised by members of the Hospital medical staff, thereby establishing qualification for exemption under components one and two of the Analytical Framework. Rehabilitation services were offered only to persons referred by a physician. An initial appointment at the admissions office in the Hospital was required. A person referred from the admissions office to the CP Rehab Service was evaluated by the Service, which prepared a treatment plan sent to the person’s referring physician for review and approval. No services were provided until the plan received approval by the physician. The CP Rehab Service had two medical directors with offices at the Hospital. These physicians established guidelines, policies, and procedures for the Service, reviewed the records of all persons seeking rehabilitation services who were referred by physicians not on the Hospital medical staff, and oversaw the emergency protocol of the rehabilitation services department of the Hospital, including the CP Rehab Service. The services at the CP Rehab Service were provided by a registered nurse from the Hospital who was trained *340 in the use of the defibrillator and other emergency equipment located in the Service office.
Because of the extensive involvement of the Hospital medical staff in the CP Rehab Service, a person undergoing rehabilitation at the Service was, in a very real sense, an outpatient of the Hospital, whether or not he or she had been an inpatient in connection with a heart attack or other cardiac or pulmonary problems. Thus, the CP Rehab Service was serving primarily hospital patients and thereby qualified for exemption under the third component of the Analytical Framework.
Based on the preceding discussion, the area of the Subject Building devoted exclusively to the CP Rehab Service qualified for exemption. Because the usage of other areas and equipment at the Wellness Center by people receiving rehabilitation services was minimal compared to usage by the general membership, the presence of the CP Rehab Service in the Wellness Center did not convert the Center into an exempt facility in the Subject Building.
The Pediatric Practice was integrated administratively and medically with the operations of the Hospital. It was a member of a department of the Hospital, was under the administrative supervision of a Hospital physician who was in charge of all Hospital-owned medical practices, and was staffed by Hospital physicians. As a result, the Practice satisfied the first two components of the Analytical Framework.
With respect to the third component, the proofs demonstrated that the Practice primarily served members of the public as distinguished from Hospital patients, and was in direct competition with pediatric practices owned and operated by private physicians in the vicinity. The president and chief executive officer of the Hospital acknowledged that a patient of the Practice was not thereby a patient of the Hospital. The competition with private pediatric practices was confirmed by HMC’s Vice-President of Professional Services who noted, in a certification submitted in connection with a summary judgment motion in this matter, that the Pediatric Practice “provided pediatric services located in the northern part of the county, thereby obviating the need for *341 northern county residents and patients to travel to the main hospital campus in Raritin [sic] Township or seek private, for profit-care.” HMC’s Vice-President for Physician Practice Management agreed that the Pediatric Practice competed with private pediatricians in the area.
Under the foregoing application of the Analytical Framework to the Pediatric Practice, the area of the Subject Building occupied by the Practice did not qualify for exemption. As discussed above, this area of the Building also failed to qualify as a result of the Practice’s profit-making purpose.i **[4]
In summary, I conclude that the areas at the Subject Building occupied by the Wellness Center, PT Service, and Pediatric Practice did not qualify for exemption during the years under appeal. Only the CP Rehab Service office on the first floor of the Wellness Center so qualified. Judgment will be entered accordingly. Counsel are directed to calculate the appropriate assessment on the Subject Building and the land on which the Building is located and submit the proposed assessments within thirty days. In the event counsel are unable to agree as to the assessments, a further hearing will be held to resolve the issue. See R. 8:9-4.

 The Spring 2004 issue of "Hunterdon Healthcare Experience”, a publication of the Hunterdon Healthcare System, advertised HMC's personal grocery shopper service, which provided a nutritionist to accompany a supermarket shopper to make sure that the foods selected were healthy. The page of the document containing the advertisement was not admitted into evidence, and the availability of the shopper service is not a basis for, or a factor in, my decision in this matter. However, one implication of the advertisement is that ownership of the supermarket by HMC is conceivable, as is a claim that the supermarket fulfills a hospital purpose.

 Fitness facilities located in Young Men’s Christian Association buildings also have been the subject of litigation under statutes granting tax exemption to facilities used for "charitable” purposes. The Oregon Supreme Court denied the exemption claim, Young Men's Christian Association of Columbia-Willamette v. Department of Revenue, 308 Or. 644, 784 P.2d 1086 (1989), but courts in California and Pennsylvania have granted the exemption to facilities similar to that at issue in the Oregon decision. Clubs of California for Fair Competition v. Kroger, 7 Cal.App. 4th 709, 9 Cal.Rptr.2d 247 (1992); City of Pittsburgh v. Board of Property Assessment, Appeals and Review, 129 Pa.Cmwlth. 69, 564 A.2d 1026 (1989). In deciding whether use of hospital-owned properties as fitness facilities constituted charitable uses, these decisions used a standard dilferent from that applied in Middle Tennessee Medical Center and Indianapolis Osteopathic Hospital. In the YMCA context, public access to the facility was essential to the granting of the exemption. In the hospital context, however, public use of a fitness facility disqualified it from exemption. The YMCA cases, therefore, are not instructive in analyzing HMC’s exemption claims. In New Jersey, real property "used for the purposes and in the work of” Young Men's Christian Associations and similar organizations is exempt from property taxation under N.J.S.A. 54:4-3.24. Research has not disclosed any case law discussing whether YMCA fitness centers qualify for exemption under this statute.

 In defining what constitutes unrelated trade or business income to a hospital under I.R.C. § 513, the Internal Revenue Service has used the test of whether the income is derived from hospital patients and has provided examples of "relationships that determine whether a person is a 'patient' of a hospital.” Rev. Rul. 68-376, 1968-2 C.B. 246, (1968). One author has suggested that the I.R.S. also employs tests relating to whether a hospital employee provided hands-on care and whether the same service or product was otherwise commercially available. Ned Randle, Tax Exempt Hospitals: The Effect of New or Expanded Services on Unrelated. Business Income and Exempt Status, 2 J. Pharmacy & L. 35, 43-44 (1993). Research has failed to disclose the basis for the author's reference to the second and third tests. The I.R.C. view of what constitutes a related hospital function appears to be far more liberal than the view adopted by the New Jersey courts in deciding the extent of the hospital purposes exemption under NJ.S.A. 54:4-3.6. Compare Rev. Rul. 69-463, 1969-2 C.B. 131 (1969) (ruling that a hospital's leasing of space, in an office building it owned adjacent to the hospital, to a private, but hospital-based, medical group did not generate unrelated trade or business income) with City of Long Branch v. Monmouth Medical Center, supra, 138 N.J.Super. at 535-36, 351 A.2d 756 (denying a property tax exemption to office space in a hospital-owned building leased to physicians affiliated with *333 the hospital who used the offices for their private practices and to perform hospital staff functions).

 In its initial post-trial brief, HMC cited an unreported bench opinion of the Tax Court in Hunterdon Medical Center v. Union Tp., Dkt. No. 004323-2003. HMC did not provide a transcript of the opinion and, therefore, violated the provisions of R. 1:36-3 relating to citation of unpublished opinions.