HOPKINS, J.T.C.
This is an appeal from the denial of a claimed local property tax exemption of a nursing home located on Block 330, Lot 1, in the taxing district of Cedar Grove. The assessments were in the amount of $1,765,100 for each of the tax years 1988 and 1989.
Hartwyck West, Inc. (HW), is a nonprofit corporation organized under N.J.S.A. 15A:1-1 et seq. Its sole member is Inter-care Health Systems, Inc. (Intercare), which is also a nonprofit corporation organized under New Jersey law. The sole members of Intercare constitute HW’s board of directors. Intercare also controls, in the same or similar manner, other nonprofit organizations, all of which, in some manner, relate to health care. They include the Community Hospital Group, Inc. (trading as John F. Kennedy Medical Center) which operates a *425 hospital (JFK); Robert Wood Johnson, Jr., Lifestyle Institute; Hartwyck Nursing, Convalescent and Rehabilitation Centers; Hartwyck West Nursing Home, Inc. (the subject); Hartwyck at Cedar Brook, Inc., in Plainfield; Hartwyck at Oak Tree, Inc., in Edison; Medishare Health Services, Inc. and the John F. Kennedy Medical Center Foundation, Inc.
HW owns and operates a 113-bed facility on the subject property. Its function can be defined as the operator of a nursing home under N.J.S.A. 30:11-8, a skilled nursing facility under N.J.A.C. 10:63-1.2, and a longterm care facility under N.J.A.C. 8:39-1.2 and 10:63-1.2. As self-described, HW is a skilled intermediate care facility providing such services as physical, occupational, recreational, and other rehabilitative therapies. Care is provided on a 24-hour basis. All patients have their own personal physicians.
Prior to 1984, the subject property was owned by Hartwyck West Nursing Home, Inc., a business corporation organized under the laws of the State of New Jersey. On January 4, 1984, its shareholders sold their stock to Intercare for approximately $7,342,000. At that time, HW operated the subject property, as well as the nursing home in Plainfield. Subsequently, pursuant to a plan of conversion filed with the secretary of state on February 17, 1984, the business corporation was converted to nonprofit status, at which time the purposes of the corporation were restated to include, among other things, the establishment, creation, ownership and operation of “such nursing, convalescent and rest homes and allied activities for the care of the sick, injured, disabled and aged as the Board of Trustees may, from time to time, deem appropriate.” Its bylaws provide that it “is organized and shall be operated exclusively for charitable, educational and scientific purposes,” as defined in the organization’s articles of incorporation. After conversion, no part of HW’s earnings were distributed to any individual. However, its financial statements for 1986 and 1987 showed distribution of surplus revenues to Intercare in the amount of $200,000 and $250,000, respectively.
*426 Prior to the date upon which Intercare acquired the stock in the business corporation operating the subject property, the property had been used as a nursing home and had been able to maintain maximum capacity in the utilization of its facilities. Subsequent to its conversion to nonprofit status, it accepted more Medicare and Medicaid patients. This was to take advantage of the increased market of available patients. HW continues to maintain a satisfactory rate of patient capacity in its current operation.
HW maintains transfer agreements with ten different community hospitals. All such hospitals, except JFK, are located in the same general geographical area as HW. JFK, as previously stated, is also a “subsidiary” of Intercare, and is located in Edison, approximately 35 miles from Cedar Grove. Transfer agreements provide for the efficient and expeditious transfer of patients and information between the institutions. Each agreement specifically provides for a cooperative program of patient transfer. However, in so doing, the agreements also provide that the affected institutions have exclusive control of their own policies, institutions, management and affairs. Such transfer agreements are deemed appropriate in establishing standards and guidelines for planning and certificate-of-need reviews of longterm care facilities. N.J.A.C. 8:33H-3.1 et seq. A request for expansion of such facilities requires evidence of transfer agreements. N.J.A.C. 8:33H-3.3(a) III(4) and IV(2). This latter regulation is directed toward having the longterm care facilities assure the reviewing authority that there is a licensed hospital to which specialized patients may be transferred within 30 minutes total transit time. As such, the mandated agreements are directed toward meeting the needs of the patient, rather than the needs of a hospital.
In 1987 and 1988, HW maintained close relations, through its personnel, with hospitals to which and from which its patients were transferred. During 1988, patient admissions to HW totalled 170, of which 137 were from hospitals and, in 1989, admissions totalled 114, of which 94 were from hospitals. The balance of admissions came from private residences or boarding *427 homes located in the surrounding communities. The nonhospital source patients were generally admitted for custodial care, including meals, and assistance in walking, washing and dressing. Of all hospital admissions during this period, only one was from JFK, in Edison. Most activity was with the Montclair Community and Mountainside Hospitals, both located in Montclair, an adjacent community to Cedar Grove.
When transferring from a hospital to a nursing home, the decision to enter a nursing home is made by the patient or the patient’s guardian. This decision is usually based on the availability of a bed, as well as the proximity of the facility to the family and the patient’s attending physician.
While HW has a medical director, he is not a full-time staff member. His duties include giving advice and recommendations with respect to the overall medical facilities. This service takes approximately three hours a week. He has his own patients in the facility and is not responsible for other patients, all of whom have their own personal physicians. HW does maintain a list of physicians from which a patient may select when he or she is without a personal physician or when the personal physician does not wish to follow the case during the patient’s confinement in the nursing facility. The retention of a listed physician is optional with the patient, since he or she will be personally charged for the physician’s services. However, the patient must have a private physician.
HW is licensed by the State of New Jersey as a skilled nursing facility and not as a hospital. It has no full-time doctors on its staff or who maintain offices in the facility. Its full-time medical staff includes registered or licensed practical nurses.
There is no dispute that HW provides a medical service to patients who are transferred from hospitals and that an expeditious patient discharge permits a hospital to make more efficient use of its facilities. It is further recognized that the method by which hospitals in New Jersey are compensated for medical services is subject to rigid controls by both the State *428 and federal governments. The New Jersey Legislature has promulgated, and the Department of Health enforces, strict limitations on the rates which a hospital may charge for its services. See N.J.S.A. 26:2H-1 et seq. These statutes provide that reasonable payment may be made only for “appropriate and necessary health care services of high quality required by its mix of patients.” The statutory obligation requires two systems. First, a reimbursement system assigns patients to a diagnosis related group (DRG). Then, a reviewing board determines whether assignment has been made to the appropriate DRG, and whether the necessary treatment has been provided. N.J.A.C. 8:31B-3.76. After a patient has remained in the hospital for the “standard” time corresponding to that DRG, the hospital is reimbursed at a lower rate or may receive no further compensation.
HW’s position is that based upon the above facts, its building is actually being used for a hospital purpose and qualifies for exemption pursuant to N.J.S.A. 54:4-3.6, which reads as follows:
The following property shall be exempt from taxation under this chapter: ... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes ... provided, in case of ... foregoing, the buildings or the lands on which they stand, or the [entities] using or occupying them as aforesaid, are not conducted for profit____ The foregoing exemption shall apply only where the [entity] claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed____
HW contends that the corporate relationship with Intercare, which was also the corporate parent of JFK, provides a relationship with a hospital, which together with the agreements which it has with JFK and other hospitals, permits it to qualify as being “organized exclusively for hospital purposes.”
It is well established that an exemption from taxation is a departure from the equitable principle that everyone should bear a just and equal share of the public burden of taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A. 2d 420 (1961). HW bears the burden of establishing that its *429 building was “actually used in the work of [a corporation] organized exclusively for hospital purposes.” Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 531, 351 A.2d 756 (App.Div.1976), aff'd o.b. 73 N.J. 179, 373 A.2d 651 (1977); New Brunswick v. Rutgers Community Health Plan, Inc., 7 N.J.Tax 491 (Tax Ct.1985). Tax exemptions are not favored and doubts are to be resolved against the one claiming the exemption. Bloomfield v. Academy of Medicine of New Jersey, 47 N.J. 358, 363, 221 A.2d 15 (1966).
In arguing that its building qualifies for exemption because it is being used for a “hospital purpose” as provided in the exemption statute, HW does not seriously propose that it is, in and of itself, a hospital. This court, in New Brunswick v. Rutgers Community Health Plan, supra, after a thorough review of the applicable law, concluded that in order to obtain an exemption from local property tax, a claimant must meet the def inition of a hospital as set out in N.J.A.C. 8:43B-1.2, which regulation was promulgated to implement the statutory provisions of N.J.S.A. 30:11-1 et seq. That regulation provides:
A private hospital is an institution, whether operated for profit or not, which is not maintained, supervised or controlled by an agency of the government of the State of any county or municipality and which maintains and operates facilities for the diagnosis, treatment or care of two or more non-related individuals suffering from illness, injury or deformity and where emergency, outpatient, surgical, obstetrical, convalescent or other medical and nursing care is rendered for periods exceeding 24 hours. [Emphasis supplied]
 The above definition requires that a hospital provide acute care services and convalescent or other medical and nursing care. This is distinct from N.J.A.C. 8:39-1.1, which provides rules and standards intended to assure the high quality of care delivered in longterm care facilities, commonly known as nursing homes. The definition of a nursing home is:
... a facility or distinct part of a facility licensed by the New Jersey State Department of Health to provide health care under medical supervision and continuous nursing care for 24 or more consecutive hours to two or more patients who are not related to the members of the governing authority by marriage, blood, or adoption; who do not require the degree of care and treatment which a hospital provides; and who, because of their physical or mental condition, require continuous nursing care and services above the level of room and board. [Emphasis supplied]
*430 HW is licensed as a longterm care facility, or nursing home. Accordingly, since it is not authorized to, nor does it, operate a hospital, its exemption claim does not qualify on that basis.
HW’s basic contention is that although it is not a hospital, its nonprofit “parent” corporation, Intercare, is authorized, according to its charter, to provide total health care. Intercare’s certificate of incorporation provides, in part, as follows:
SECOND: The purposes for which this corporation is formed are:
(a) To establish, maintain, administer, operate and manage, either directly, through subsidiaries or in cooperation with other organizations, such facilities and services providing health care for sick, injured, disabled, or aged persons providing for the preservation of health as the Board of Directors may deem from time to time appropriate, including but not limited to, hospitals, hospital centers, infirmaries, dispensaries, clinics, laboratories, nursing homes, home health care centers, fitness centers, rehabilitation clinics for the handicapped, schools and educational training centers for medical technicians, nurses and others and services of every kind and nature which will add to and improve the quality of health and the delivery of health care services to the general public and the community served by the corporation.
Based on the above, and the fact that Intercare also effectively controls JFK, HW contends that it is sufficiently integrated to have its building qualify as part of Intercare’s medical operations.
In Long Branch v. Monmouth Medical Center, supra, the court stated, in discussing a claimed hospital exemption, that in order to qualify for a tax exemption:
Each case must be reviewed individually, and the party claiming the exemption must bear the ultimate burden of proving both that it was organized exclusively for one of the purposes enumerated in N.J.S.A. 54:4-3.6 and that the property for which the exemption is claimed is “actually and exclusively used for such purpose.” [138 N.J.Super. at 531, 351 A.2d 756]
In order to apply the known facts to the above requirements, it is necessary to determine what is meant by “organized exclusively.” “Organized” is defined as “having a formal organization to carry out activities.” Webster’s New Collegiate Dictionary (1979) at 802. See also The American Heritage Dictionary (2 coll, ed), in which the word “organize” is defined as:
1. To put together into an orderly, functional, structural whole. 2. a. To arrange in a coherent form: systematize ... b. To arrange in a desired pattern or structure.... [at 876]
*431 Further, the word “exclusively,” which follows “organized” in the definition, is intended to describe a full hospital operation, rather than a requirement that an entity confine its total activities to the operation of a hospital. This principle was implicitly recognized in Long Branch v. Monmouth Medical Center, supra, when the court granted the exemption to buildings totally integrated into the hospital operation, but denied the hospital exemption to a building, owned by the hospital, that was partially integrated and partially rented. The fact that the entity operating the hospital also engaged in commercial rental activities did not affect the exemption of buildings fully used in its hospital operation. Further analyzing the pertinent language of the statute, the term “hospital purposes” does not mean hospital-type activities performed by nonhospital integrated entities. The word “purpose” is defined as “something set up as an object or end to be attained.” Webster’s New Collegiate Dictionary, supra at 930. A hospital purpose is an activity that is integrated into an organized hospital operation. Accordingly, HW’s building, to qualify as being used for a hospital purpose, must be an integral part of a functioning hospital. In so qualifying, its corporate relationship with Intercare is not the criterion. The test to be applied to HW’s relationship with JFK is the same as that to be applied to all other hospitals with which HW had medical care relationships. That test is whether HW’s operation was sufficiently integrated with a hospital so that its building’s use was an integral part of operating a functioning hospital. See New Brunswick v. Rutgers Community Health Plan, Inc., supra, where the court stated:
There are many purposes that may constitute hospital purposes when performed in conjunction with the functioning of a hospital. These will lose their qualifying status when disassociated with a hospital and performed independently and not for the purpose of accomplishing the objectives of a hospital____ The facilities serving these purposes all exist for hospital purposes to the extent that they are an integral part of, and are reasonably necessary for, the proper and efficient operation of the hospital facility. [7 N.J.Tax at 506; emphasis supplied]
The record shows that HW was a nursing home that rendered subacute care to patients with varied physical or *432 mental ailments. Longterm care was generally devoted to the aged. However, HW also administered rehabilitative care. The relationships which it had with various hospitals were cooperative, rather than integral. HW supplied a medical service which acute care hospitals were not intended or were disinclined to provide. Patients which were transferred from hospitals to HW were moved because the hospitals had completed all hospital, or acute care services, and the patients desired, personally, to go to HW’s nursing home for subacute medical care. The “Transfer Agreements” entered into between HW and the various hospitals were implemented to facilitate patient care, rather than to integrate HW’s subacute care program into the hospitals’ functions. This is particularly recognized in those provisions stating that each party retained exclusive control over its own policies, institutions, management and officers. The retention of such rights is inconsistent with an integration into a functioning hospital facility.
Since HW does not function as an authorized hospital, and its building’s use is not fully integrated into the functions of an authorized operating hospital, its building cannot qualify as being used for a hospital purpose.
Neither party argued, and it is not necessary to decide under the facts and applicable law, whether HW’s building was partially exempt under the statutory provisions. Further, no issue was raised relative to the transfer by HW of surplus revenue to Intercare. See Princeton Univ. Press v. Princeton, supra.
The assessments are affirmed.