951 A.2d 931

HUNTERDON MEDICAL CENTER, PLAINTIFF-APPELLANT,
v. TOWNSHIP OF READINGTON, DEFENDANT-
RESPONDENT.

Argued January 22, 2008—Decided July 14, 2008.

551

552

*Susan A. Feeney* argued the cause for appellant (*McCarter & English*, attorneys; *Ms. Feeney* and *Daniel P. Zazzali*, on the briefs).

*Martin Allen* argued the cause for respondent (*DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer,* attorneys; *Joseph V. Sordillo,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In New Jersey, all real property is subject to local property taxation, *N.J.S.A.* 54:4–1, unless its use has been exempted. *See N.J. Const.,* art. VIII, § 1, ¶ 2 (authorizing legislatively sanctioned tax exemptions based on property's use). One such exemption is found in *N.J.S.A.* 54:4–3.6, which exempts real property used in the work of various nonprofit organizations, including "all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes."

The issue raised is the applicability of that exemption to a rural hospital's off-site building that houses its Health and Wellness Center through which the hospital provides physical therapy and cardio-pulmonary rehabilitation services for patients choosing to attend that location as opposed to seeking those services at the hospital's main facility. Whether the property is exempt depends on the sweep of the term "hospital purposes" in *N.J.S.A.* 54:4–3.6. The Tax Court developed, and the Appellate Division affirmed, a test that examined the degree to which the off-site facility's activities operationally were integrated and supervised by hospital medical staff. *Hunterdon Med. Ctr. v. Readington Twp.,* 22 *N.J.Tax* 302, 332–33 (2005), *aff'd,* 391 *N.J.Super.* 434, 918 *A.*2d 675 (App.Div.2007). Although we find such factors to be relevant in the inquiry, we conclude that the key first step in our analysis must be to determine the meaning of "hospital purposes" in *N.J.S.A.* 54:4–3.6.

In our view, the analysis for "hospital purposes" must take into consideration the many medical pursuits permitted to the "modern" hospital in New Jersey. A hospital can no longer be restrictively equated with a nineteenth, or even twentieth, century vision of a monolithic building, in which is offered continuous inpatient care or emergency treatment, twenty-four hours per day, to the

sick, disabled, and infirm. Licensing authorities have allowed hospital activities to evolve as inpatient stays have diminished. Today, treatment often is delivered on an outpatient basis at a hospital's main facility, as well as at off-site facilities, backed up by the promise of ready inpatient care from the general, acute-care hospital when necessary. Thus, a fair definition of core "hospital purposes" must acknowledge the variety of activities that a modern hospital can be expected to perform for patients, be they inpatients or outpatients. That said, a hospital's expansive view of its mission does not necessarily equate with "hospital purposes" in the tax exemption analysis.

We therefore hold that any medical or diagnostic service that a hospital patient may require pre-admission, during a hospital stay (whether it is for less than a day or for one or more days), or post-admission presumptively constitutes a core "hospital purpose." Beyond having to satisfy that definition, other factors should be considered when an entity, organized for hospital purposes, claims an exemption for an off-site building (not on adjacent or adjoining property) that is allegedly being used to provide hospital-integrated medical services. For such off-site medical activities that fit within our definition of core "hospital purposes," we adopt, in large part, the hospital-integration and related factors identified by the Tax Court and affirmed by the Appellate Division in this matter.

I.

A.

Hunterdon Medical Center (HMC), a nonprofit corporation organized under *N.J.S.A.* 15A:1–1 to 16–2, owns and operates a general, acute-care hospital in Flemington, New Jersey. *See N.J.A.C.* 8:43G–1.3 (establishing classifications of hospitals). Its certificate of incorporation, in effect from 1983 through 2001, reflected that it was organized for charitable purposes,

> including the establishment, erection, operation, support and management of a hospital and a medical and health center or institution, and related facilities, where

medical and surgical diagnosis, treatment, care, and nursing, and improvement of, and benefits to, [patient] health, will be rendered to persons of any creed, race, nationality, or color; and also including as a part thereof, medical research, the training of physicians and auxiliary personnel.

Although HMC adopted an amended certificate of incorporation in May, 2001, the overall import of the purpose clause remained unchanged.[1] HMC was organized to operate a hospital and related ancillary facilities and services.

The record before the Tax Court demonstrated that in 1998 HMC opened its Health and Wellness Center (Wellness Center or Center) on the property at issue. According to HMC, the Center plays an integral part in the hospital's provision of continuum-of-care services to the community it serves. Through exercise, fitness, diet, and other programs, HMC promotes physical and mental wellness and health consciousness. The Center also provides physical therapy and cardio-pulmonary rehabilitation for patients who require such services and who prefer to take advantage of the Center's more convenient location in Readington Township rather than travel to HMC's main facility in Flemington for therapy sessions.[2]

---

[1] The amended certificate of incorporation stated:

(A) Hunterdon Medical Center (the "corporation") is organized and shall be operated exclusively for charitable, scientific or educational purposes, within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986 and the Regulations thereunder as they now exist or as they may hereafter be amended . . ., including without limitation for the purposes more particularly set forth below in this Article SECOND.

(B) More specifically, the purposes for which this corporation is formed are charitable, including the establishment, erection, operation, support and management of a hospital and a medical and health center or institution, and related facilities, where medical and surgical diagnosis, treatment, care, and nursing, and improvement of, and benefits to, their health, will be rendered to persons of any creed, race, nationality, or color; and also including as a part thereof, medical research, the training of physicians and auxiliary personnel.

[2] The property is situated nine and one-half miles from the main Flemington hospital campus. It is identified as Block 34, Lot 31.01 on the Readington

In addition to housing the Center, with all its component parts, the building also contains a hospital-owned pediatric physician practice (Pediatric Practice), which had existed as a private practice prior to its acquisition in December 1997.[3] The Center, however, fully occupies the first two floors of the building. Its main area is located on the first floor (approximately 16,000 square feet) and includes a pool, running track, weight training and aerobic exercise equipment, locker rooms, and reception and classroom areas. During the tax years in question, the Center was open to the general public through the payment of membership dues. However, individuals also could access the fitness equipment and facilities if they were patients of one of the two services that the hospital provides through the Center, namely, physical therapy and cardio-pulmonary rehabilitation.

The Center also has space on the building's second floor that houses a suite for the Center's physical-therapy service program (PT Service) that contains treatment rooms for private physical therapy. The Center's second-floor space also contains exercise equipment specifically oriented to physical therapy. PT patients have priority over the use of the second-floor equipment; however, all Center users can access it. Conversely, PT patients use the general exercise equipment and facilities available on the first-floor of the Center, as do the cardio-pulmonary rehabilitation patients who are served through the specialized Cardio–Pulmonary Rehabilitation (CP Rehab) program that HMC also provides through the Center.

Prior to the 2000 tax year, HMC's Readington facility had received an exemption from local property tax, pursuant to *N.J.S.A.* 54:4–3.6. However, for the 2000 tax year and all subse-

---

Township Tax Map. A three-story building, totaling 26,055 square feet, improves the property.

[3] The Pediatric Practice is located in one of two offices on the building's third floor. The other office is leased to a private cardiology practice. HMC has never claimed a tax exemption for the space leased to the cardiologists.

quent years, the Readington Township Tax Assessor revoked the tax exemption and issued a tax assessment of $3,300,000 for the property, $2,000,000 of which was allocated to the facility. HMC filed complaints with the Tax Court for the 2000 through 2005 tax years, seeking the reinstatement of the tax exemption for the Wellness Center in its entirety, including its PT Service and CP Rehab Service, and the Pediatric Practice.[4] The Tax Court conducted an eight-day trial that focused on the 2000, 2001, and 2002 tax years,[5] and concluded that only the space exclusively dedicated to the CP Rehab Service qualified for exemption under *N.J.S.A.* 54:4–3.6. *Hunterdon Med. Ctr., supra,* 22 *N.J.Tax* at 341. The court declared the remainder of the building—the areas that house the Wellness Center, with its PT Service area, as well as the Pediatrics Practice—taxable. *Ibid.* The court found that the Pediatric Practice failed the not-for-profit criteria for exemption contained in *N.J.S.A.* 54:4–3.6. *Id.* at 319–20. As for the Wellness Center and the PT Service, the court determined that HMC did not establish that those activities were uses for the exempt purpose. *Id.* at 341.

HMC argued that the uses were reasonably necessary to the hospital's declared mission to provide a continuum of care to members of the community. The Tax Court rejected HMC's application of the well-established "reasonably necessary test," *id.* at 326–29, finding it unhelpful in the evaluation of the particular use of this property. *See City of Long Branch v. Monmouth Med. Ctr.,* 138 *N.J.Super.* 524, 532–33, 351 *A.*2d 756 (App.Div.1976), (adopting "reasonably necessary" test to evaluate whether hospital-owned, ancillary-use property served hospital's exempt purpose), *aff'd o.b.,* 73 *N.J.* 179, 373 *A.*2d 651 (1977). The court explained that no prior decision addressing a "hospital purposes"

---

[4] HMC also contested the assessment value for all six tax years under review. However, the parties stipulated to the assessment value prior to the delivery of the Tax Court's decision.

[5] The parties agreed that the Tax Court's decision also would control the Wellness Center's exemption status for the 2003, 2004, and 2005 tax years.

exemption had concerned a hospital-owned facility having charac-
teristics like those present in this matter, namely

> (1) ownership and operation by a hospital; (2) a location distant from the main
> hospital campus; (3) not used for a purpose ancillary to and supportive of the
> hospital's core function; and (4) used as part of the hospital's continuum of care
> and its mission to enhance and improve the general health status of the population
> in the local area.
>
> [*Hunterdon Med. Ctr., supra,* 22 *N.J.Tax* at 326.]

Describing the "continuum of care" mission to be a new and
materially expanded version of "hospital" services than that which
prior case law had recognized for tax-exemption purposes, *ibid.,*
the court devised its own analytical framework for differentiating
between off-campus hospital facilities that would qualify for tax
exemption under *N.J.S.A.* 54:4–3.6, and those that would not. *Id.*
at 332.

> The court's test comprised three components:
>
> 1. the nature and extent of the integration between the hospital and the subject
>    facility. The greater the integration the more likely it is that a facility is
>    serving a hospital purpose. In applying this component, the distance of the
>    facility from the hospital campus must be considered . . . ;
> 2. the extent to which the activity conducted in the facility is under the control or
>    supervision of the hospital medical staff. The lesser the amount of supervision,
>    the more likely it is that the activity is not serving a hospital purpose; and
> 3. whether the facility serves primarily hospital patients or primarily members of
>    the general public. For purposes of this determination, a person generally
>    should not be deemed a hospital patient merely as a result of using the
>    facility. . . . Under some circumstance, however, a person using a hospital-
>    owned and operated off-campus facility could become a hospital patient by
>    virtue of that use. . . .
>
> [*Ibid.*]

The court added two further considerations to the third compo-
nent.

> The first relates to the extent to which the hospital facility competes with
> commercial or privately owned-facilities in the area. Competition in itself does not
> provide a basis to deny an exemption. However, the existence of competition with
> private facilities should not be totally ignored.
>
> The second additional consideration relates to whether an exemption can be
> granted in proportion to the percentage of use by hospital patients of a specific
> facility within a building. . . .
>
> . . . [T]he predominant use standard should be incorporated into the third compo-
> nent of the [a]nalytical [f]ramework, not in order to apportion the tax exemption for

a particular facility, such as the Wellness Center, based on percentage of use for hospital purposes, but in order to determine whether or not the facility, in its entirety, qualifies for exemption.

[*Id.* at 333.]

The Tax Court applied that analytic framework to the Center and separately to the PT Service, concluding that each should be declared ineligible for exemption under *N.J.S.A.* 54:4–3.6 because neither met the newly articulated methodology for assessing whether prong two of the statutory exemption—use for the exempt purpose—was satisfied.[6]  HMC appealed.  In affirming the Tax Court's judgment, the Appellate Division summarized the Tax Court's reasoning.

The Wellness Center did not qualify because there was no integration of the care provided at the hospital with the activities and programs of the Center; there was virtually no supervision of or interaction with its members by the hospital's medical staff; and the vast majority of individuals using the facility were members of the general public, paying a membership fee.  The [tax] court found the PT Service did not qualify for exemption because it was not integrated medically and received no meaningful supervision by the hospital medical staff, nor did it serve primarily hospital patients referred for continuation of treatment.

[*Hunterdon Med. Ctr. v. Readington Twp.*, 391 *N.J.Super.* 434, 443–44, 918 *A.*2d 675 (App.Div.2007).]

In affirming those determinations, the Appellate Division accepted the Tax Court's analytic construct as an appropriate means for examining whether a hospital's off-site, medically used facility is being used for "an exempt purpose" and agreed with the new test's applications to this matter.  *Id.* at 446–48, 918 *A.*2d 675.

We granted HMC's petition for certification.  192 *N.J.* 72, 926 *A.*2d 856 (2007).[7]

---

[6] As noted, the Pediatric Practice was declared ineligible for exemption for differing reasons, and the CP Rehab Service was found exempt.

[7] In its petition for certification, HMC sought review of the analytic framework and contested the denial of tax-exempt status to the PT Service.  According to the record, the PT Service is located on the facility's second floor.  At argument, however, HMC asserted that its petition seeking relief from the denial of tax-exempt status for the PT Service also required review of the exemption denial for the Wellness Center's first-floor facilities because those also are used by PT

## II.

HMC urges this Court to reject the test constructed by the Tax Court because it includes factors that are immaterial to the statutory criteria for a property's exemption, as explained in *Paper Mill Playhouse v. Millburn Township*, 95 *N.J.* 503, 472 *A*.2d 517 (1984).[8] According to HMC, this appeal can be resolved by application of the reasonably necessary test, which, HMC argues, has been the only standard used to evaluate whether a hospital's off-site property serves "hospital purposes." Under that test, HMC asserts that we should accept the hospital's mission statement—here, to provide a continuum of care to members of its community—as the "hospital purpose," and apply the reasonably necessary standard to any off-site medical endeavor by the hospital that is claimed to further that purpose.

Defendant, Readington Township, on the other hand, urges adoption of the Tax Court's analytic framework and defends its application to the facts presented in this record.

## III.

HMC claims exemption for its facility under *N.J.S.A.* 54:4–3.6, which provides, in pertinent part:

> The following property shall be exempt from taxation under this chapter: ... all buildings *actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt;* ... provided, in case of all of the foregoing, the buildings, or the lands on which they stand, or

---

patients. We reject that broad characterization of the issue presented to us in the petition for certification. *See infra* at 574 n. 17, 951 *A*.2d at 946 n. 17.

[8] For example, HMC disputes that the Legislature ever intended to limit "hospital purposes" to only those services that have a significant level of supervision by a physician. Similarly, HMC argues that using competition with commercial services as a factor for consideration is flawed because many hospital inpatient or outpatient services would technically be in competition with a similar service offered in the vicinity of a hospital.

the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit.... The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed....

[ (Emphasis added) ].

As this Court has recognized, *N.J.S.A.* 54:4–3.6 requires three criteria for exemption, "(1) [the owner of the property] must be organized exclusively for the [exempt purpose]; (2) its property must be actually and exclusively[9] used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit." *Paper Mill, supra,* 95 *N.J.* at 506, 472 *A.*2d 517. Although *Paper Mill* involved the exemption provided under the "organizations devoted to the moral and mental improvement of men, women and children" clause of *N.J.S.A.* 54:4–3.6, the standard developed in that case has been incorporated for use in assessing the hospital exemption as well. *See, e.g., Presbyterian Home at Pennington, Inc. v. Pennington Borough,* 23 *N.J.Tax* 473, 494 (Tax 2007); *Jersey Shore Med. Ctr. v. Neptune Twp.,* 14 *N.J.Tax* 49, 54 (Tax 1994); *see also Roman Catholic Archdiocese of Newark v. City of E. Orange,* 18 *N.J.Tax* 649, 653 (App.Div. 2000) (applying *Paper Mill* standard to religious purposes exemption); *Essex Props. Urban Renewal Assocs. v. City of Newark,* 20 *N.J.Tax* 360, 364 (Tax 2002) (applying *Paper Mill* standard to charitable purposes exemption).

In this appeal, there is no longer any dispute that the first and third prongs of the *Paper Mill* test are satisfied. The Tax Court held that HMC is organized exclusively for hospital purposes, rejecting an argument that HMC's revised Certificate of Incorporation broadened its purpose clause to the point that it lost its tax-exemption eligibility under *N.J.S.A.* 54:4–3.6. *See Hunterdon Med. Ctr., supra,* 22 *N.J.Tax* at 315–17. Further, in respect of the

---

9 The requirement that hospital-owned real property be "exclusively" used for hospital purposes was deleted by legislative amendment in 1983. *See L.* 1983, *c.* 224, § 1.

property remaining in issue—the PT Service area—there is apparent agreement that the PT Service was not established or run as a profit-making operation. *See id.* at 317 (noting Township's claim of for-profit conduct only in respect of Wellness Center (excluding PT Service and CP Rehab Service) and Pediatric Practice).

Before this Court, the dispute has centered squarely on whether the hospital's operation of a PT Service in this off-site building constitutes hospital-owned property that is "actually used" for the permitted exempt purpose, which *N.J.S.A.* 54:4–3.6 identifies only as "hospital purposes." To answer that question for the PT Service, as well as for the other portions of the building that were in dispute earlier in this matter, the tribunals below considered prior case law that had evaluated the "use for the exempt purpose" requirement of *N.J.S.A.* 54:4–3.6 in connection with hospital-owned property. The test, known as the "reasonably necessary" test, had been employed to assess whether particular types of ancillary, non-medical hospital property were actually "in use" for the exempt "hospital purposes." The Tax Court concluded that that prior law was inadequate to the task and constructed its own test, which the Appellate Division endorsed. Accordingly, we begin, as did the Tax Court, by turning to the case law through which the reasonably necessary test developed to determine whether it provides assistance in the analysis of the present matter.

## IV.

The reasonably necessary test entered our jurisprudence in 1961 with the Appellate Division's decision in *Township of Princeton v. Tenacre Foundation,* 69 *N.J.Super.* 559, 174 *A.*2d 601 (1961). In *Tenacre,* a non-profit corporation [10] operating a sanatorium and nursing home challenged the tax assessment levied against the corporate director's on-site residence. *Id.* at 560–61,

---

[10] The corporation also operated under the auspices of "The First Church of Christ, Scientist, Boston, Massachusetts." *Id.* at 5601.

174 *A*.2d 601. The residence also served as a meeting place, housed corporate records, and contained a guestroom for official visitors. *Id.* at 561–62, 174 *A*.2d 601. In determining whether the property was "actually and exclusively" used for a hospital purpose pursuant to *N.J.S.A.* 54:4–3.6, the Appellate Division found that no New Jersey case had considered whether a hospital's tax exemption should be applied to a residence. *Id.* at 563–64, 174 *A*.2d 601. Accordingly, the panel embraced a test adopted, in the first instance, by the Supreme Court of California:

> [T]he phrase "property used exclusively for … hospital … purposes" should be held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of hospital purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern hospital.
>
> [*Id.* at 564, 174 *A*.2d 601 (quoting *Cedars of Lebanon Hosp. v. L.A. County,* 35 *Cal*.2d 729, 221 *P*.2d 31, 35 (1950)).]

The panel determined that the residence served as an integral part of the hospital organization's operations, rather than just a convenience, because the dwelling's location enabled the director to be available, on-site, twenty-four hours a day. *Id.* at 565, 174 *A*.2d 601. Thus, because the residence was "reasonably necessary for the efficient functioning of the institution," the Appellate Division concluded that the actual-and-exclusive-use requirement of the statutory tax exemption was met. *Id.* at 565–66, 174 *A*.2d 601.

Subsequent courts have applied the reasonably necessary standard to various hospital-owned, ancillary (non-medical) properties or buildings. Property being put to a non-medical, but arguably supportive, operational purpose has been deemed reasonably necessary to a "hospital purpose" whenever the property has assisted the hospital's functioning as a twenty-four-hour, continuous care operation. The sole prior case from this Court involving a hospital's use of non-medical ancillary property is *City of Long Branch v. Monmouth Medical Center,* 138 *N.J.Super.* 524, 351 *A*.2d 756 (App.Div.1976), *aff'd o.b.,* 73 *N.J.* 179, 373 *A*.2d 651 (1977).

■ In *Long Branch*, the Appellate Division considered whether a non-profit hospital corporation could receive a tax exemption for a number of differing types of buildings: apartments housing the hospital's resident doctors, interns, and nurses; an office building that the hospital rented to a community college and to private medical practices; a clinical building that also contained a retail pharmacy; and a three-story office building annexed to the hospital that housed several hospital departments,[11] the Monmouth County Medical Examiner, and private medical practices rented primarily to hospital-affiliated physicians. *Id.* at 527–30, 351 A.2d 756. Citing the reasonably necessary test enunciated in *Tenacre*, the *Long Branch* appellate panel, which we affirmed, determined that the apartments were reasonably necessary for the hospital to operate as an efficient twenty-four-hour, continuous care facility. *Id.* at 533, 351 A.2d 756. The apartments, located less than two blocks from the hospital, were offered at below-market rental rates. *Id.* at 532–33, 351 A.2d 756. Their location and low cost were found to help attract qualified staff and to contribute to the hospital's efficient operation. *See id.* at 533, 351 A.2d 756.[12]

---

[11] This building was used by several of the hospital's departments, including security, public relations and finance offices, medical education, cardiac physiology, renal dialysis, inhalation therapy, and a "tumor registry."

[12] All of the other buildings were found ineligible because they were not "actually and exclusively" used for hospital purposes, but rather each contained some disqualifying private commercial activity, such as private physician practices, a pharmacy, and a community college. *Id.* at 535–38, 351 A.2d 756. Even the office building that housed some hospital departments, along with private physician practices, was rejected in its entirety. *Ibid.* The panel rejected an argument that the convenience of having hospital-affiliated doctors maintain offices in close proximity to the hospital justified application of the exemption for the entire hospital-owned building. *Id.* at 535, 351 A.2d 756.

In response to *Long Branch*, *supra*, the Legislature amended *N.J.S.A.* 54:4–3.6, omitting the "exclusively used" requirement for hospital property. *See L.* 1983, *c.* 224 § 1. Presently, a hospital facility, or any part thereof, may receive a tax exemption when it is "actually used in the work of associations and corporations organized exclusively for hospital purposes." *Ibid.* Thus, a hospital-owned and

After *Long Branch*, courts have clarified the instances when tax exemptions apply to a hospital's off-site housing, each time using the reasonably necessary standard when evaluating the property's connection to the hospital's operations. *See Perth Amboy Gen. Hosp. v. City of Perth Amboy*, 176 *N.J.Super.* 307, 422 *A.*2d 1331 (App.Div.1980) (finding that condominium housing for resident and intern physicians and their families was tax exempt, despite its location one and one-half miles from main hospital building), *certif. denied*, 87 *N.J.* 352, 434 *A.*2d 96 (1981); *see also City of Summit v. Overlook Hosp. Ass'n*, 4 *N.J.Tax* 183, 192–93 (Tax 1982) (finding hospital's off-site housing for resident physicians, surgical students, nurses, laboratory technicians, and x-ray technology students to be reasonably necessary for hospital's purpose to provide emergency care and qualified staff), *aff'd*, 6 *N.J.Tax* 438 (App.Div. 1984).

The reasonably necessary test also has been used to evaluate the connection between other types of ancillary, off-site property and "hospital purposes." Parking garages have been found to further a hospital's exempt purpose under the reasonably necessary test. *See Overlook Hosp. Ass'n v. City of Summit*, 6 *N.J.Tax* 90, 96–97 (Tax 1983) (granting exemption for parking garage located near main hospital building and managed by independent contractor), *aff'd*, 6 *N.J.Tax* 350 (App.Div.1984); *see also City of Hackensack v. Hackensack Med. Ctr.*, 9 *N.J.Tax* 460, 463(Tax) (finding hospital's parking lot, located blocks from hospital, did not qualify for tax exemption), *aff'd*, 228 *N.J.Super.* 310, 549 *A.*2d 869 (App.Div.1988), *certif. denied*, 114 *N.J.* 498, 555 *A.*2d 619 (1989). Courts also have used the test when determining whether such facilities as hospital on-site day care operations and coffee shops should qualify. *See, e.g., Jersey Shore, supra*, 14 *N.J.Tax* at 60.

In *Jersey Shore*, the issue was whether a hospital's on-site coffee shop and child care center could receive a tax exemption.

---

-used building is no longer completely disqualified merely because a portion of the building does not qualify for the exemption.

*Id.* at 53. The exemption for the child care center was granted because the tax court determined that the use furthered a core aspect of a hospital's unique services, described as the readiness to provide "continuous medical and nursing care." *Id.* at 68. On the other hand, the exemption for the coffee shop was rejected because the shop was operated pursuant to a profit-sharing agreement between the hospital and the company operating the coffee shop. *Id.* at 59, 65. Discussion of the reasonably necessary test was superfluous to that part of the *Jersey Shore* decision, however, and the Tax Court recognized as much when it stated that although "various services, such as laundry, accounting, parking, and residential housing for hospital personnel, may be reasonably necessary to a hospital purpose if associated with a functioning hospital . . ., [h]ere, the profit-making purpose of the arrangement precludes an exemption." *Id.* at 65.[13]

■ Thus, the reasonably necessary test, as originally incorporated into our case law, had a clear purpose: it assessed the connection between the ancillary-use property and the reason for the exemption (the furtherance of "hospital purposes") to determine whether there was a sufficient operational justification for the exemption to apply to the questioned property. When applying the test, reviewing courts have assumed that "hospital purposes" could be distilled to the provision of twenty-four-hour/seven-days-per-week diagnosis and treatment of the sick and injured. *See, e.g., Long Branch, supra,* 138 *N.J.Super.* at 533, 351 *A.2d* 756. Based on that assumed service need, the reasonably-necessary-test cases have evaluated the link between the use of specific

---

[13] The use-for-an-exempt-purpose test is superfluous when property is otherwise ineligible because a for-profit activity is conducted on it or because the property itself is not owned by an entity eligible for tax exemption under *N.J.S.A.* 54:4–3.6. *See, e.g., Hillcrest Health Serv. Sys., Inc. v. Hackensack City,* 18 *N.J.Tax* 38, 46–47 (Tax 1998)(holding that hospital building owned by hospital's parent corporation, in which was housed fitness center among other things, was not entitled to tax exemption under *N.J.S.A.* 54:4–3.6 because parent corporation's certificate of incorporation did not restrict corporate activities solely to operation of hospital).

hospital-owned, non-medical property and how that use furthered a hospital's generalized purpose to provide round-the-clock, continuous-care medical operations. The reasonably necessary test does not assist in the determination of whether a hospital, in embarking on a medically oriented task, has exceeded permissible "hospital purposes" because the test itself does not define "hospital purposes." That shortcoming was recognized by the Tax Court below. *Hunterdon Med. Ctr., supra,* 22 *N.J.Tax* at 326.

The cases that have come closest to defining what constitutes "hospital purposes" have involved buildings owned by non-hospital entities, where the claim is made that the property nevertheless should receive a tax exemption because the building's use is serving a hospital-like purpose. *See City of New Brunswick v. Rutgers Cmty. Health Plan, Inc.,* 7 *N.J.Tax* 491, 494 (Tax 1985); *see also Intercare Health Sys., Inc. v. Cedar Grove Twp.,* 11 *N.J.Tax* 423, 428 (Tax 1990), *aff'd,* 12 *N.J.Tax* 273 (App.Div.1991), *certif. denied,* 127 *N.J.* 558, 606 *A.*2d 369 (1992).

In *Rutgers Community Health Plan, supra,* a tax exemption was denied to a health care clinic center owned and operated by a non-profit health maintenance organization (HMO). 7 *N.J.Tax* at 508. Although the center offered a full range of diagnostic services, it was not operated twenty-four hours a day. *Id.* at 497. The Tax Court held that the center was not a hospital and, further, that the HMO lacked sufficient integration with a hospital to support a finding that the HMO was organized for "hospital purposes" within the meaning of *N.J.S.A.* 54:4–3.6. *Id.* at 504, 507.

In reaching its conclusion that the HMO was not "a hospital," the Tax Court reviewed definitions from various dictionaries, legislation, and precedent. *Id.* at 499–503. Ultimately, the court defined a "hospital" as a facility that provides "continuous long term care for periods exceeding 24 hours." *Id.* at 502–03 (citing then-existing *N.J.A.C.* 8:43B–1.2). The court determined that the center was undeserving of "hospital" status because it did not provide "24–hour continuous care" and all that the term implicates, including "maternity and nursery facilities, major surgery,

cardiac care facilities, intensive care facilities, and 24–hour emergency service." *Id.* at 503. The court also explained that the center was not used for "hospital purposes" in that it served only the needs of the HMO and its members. *Id.* at 507; *cf. Intercare Health, supra,* 11 *N.J.Tax* at 432 (rejecting exemption for nursing home that was neither owned nor operated by hospital but rather maintained transfer agreements with ten nearby hospitals).

In sum, the reasonably necessary test adds no substantive component to an analysis of the exempt purpose,[14] here "hospital purposes." *See Hunterdon Med. Ctr., supra,* 391 *N.J.Super.* at 442, 446, 918 *A.2d* 675 (recognizing same and noting need for additional guidance elaborating on limits to "hospital purposes"). The courts below rejected HMC's argument that it could have a self-defining mission, broadly described as a "continuum of care" plan, which would permit property-tax exemption for any hospital facility that furthered a health-related activity. We agree with those courts' rejection of the circular logic at work in HMC's argument.

The key is to infuse meaning into the concept of "hospital purposes" so that the statutory exemption can be consistently applied. The decisions of the courts below omit analysis of whether the narrow definition of a "hospital," as set forth in *Rutgers Community Health Plan* and Jersey Shore, should control the interpretation of and limit the application of "hospital purposes" in *N.J.S.A.* 54:4–3.6. *Hunterdon Med. Ctr., supra,* 391 *N.J.Super.* at 442, 918 *A.2d* 675 (citing Tax Court's difficulty with altering definition of "hospital" that had been distilled to "[a] 24–hour continuous acute care facility" (internal quotation marks

---

[14] *Cf. Roman Catholic Archdiocese of Newark v. City of E. Orange,* 18 *N.J.Tax* 649, 652–54 (App.Div.2000) (applying reasonably necessary test to assess whether ancillary use of plaintiff's facility to store religious artifacts and records, to conduct meetings of parish priests, and for youth activities was integral to exempt purpose; test was not applied to whether quantity or quality of religious use of church property for sacraments was sufficient to entitle plaintiff to tax exemption for "religious purpose").

omitted)). Although we recognize that "statutes granting exemptions from taxation are to be strictly construed against those seeking exemption," the statutory language and intent to grant the exemption should not be thwarted. *Paper Mill, supra,* 95 *N.J.* at 506–07, 472 *A.*2d 517. Certainly, whatever it is, a hospital is a place where a patient can obtain twenty-four-hour continuous care, however, we find that limiting definition, used in *Rutgers Community Health Plan,* to be too restrictive to control what should be recognized as legitimate "hospital purposes" for purposes of the tax exemption provided by *N.J.S.A.* 54:4–3.6.

## V.

### A.

In our view, any effort to encapsulate what a hospital must provide for its patient population reasonably would include any service, medical and diagnostic, required by its patients. Such required services necessarily would include services needed both pre- and post-admission to the hospital, whether as an inpatient or outpatient. That such a range of services are core to a hospital's functioning on behalf of its patient population is mirrored in such ready regulatory sources as in the licensing standards for hospitals. The Department of Health and Senior Services, which promulgates hospital licensing standards, presently defines a "hospital" as "an institution ... which maintains and operates facilities for the diagnosis, treatment or care of two or more non-related individuals suffering from illness, injury or deformity and *where emergency, out-patient,* surgical, obstetrical, *convalescent or other medical and nursing care is rendered* for periods exceeding 24 hours." *N.J.A.C.* 8:43G–1.2 (emphasis added).

That all-encompassing definition of the term "hospital" illuminates, but does not restrict, the legitimate purposes to which a hospital can act. A canvass of regulatory sources reveals a panoply of rules governing hospital services, including a comprehensive listing of mandatory services. *See N.J.A.C.* 8:43G–2.12

(listing professional departments, services, facilities, and functions that general hospitals must provide). Among the vast array of professional activities that a general hospital must provide are departments of anesthesia, medical and surgical services and medical staff, emergency care, out-patient and preventive services, physical therapy, radiology, respiratory therapy services, clinical and pathological laboratories, electrocardiogram laboratory, morgue and autopsy facilities, pharmacy, blood bank, and social work. *Ibid.* Regulatory provisions also address those services that a hospital may provide. *See, e.g., N.J.A.C.* 8:43G–2.11 (authorizing hospitals to provide off-site, ambulatory-care service facilities that may be free-standing or that may be considered sufficiently integrated to be "hospital-based"). Licensing requirements further detail what a hospital must demonstrate in order to be authorized to embark on a licensed activity, on-premises or off-premises. *See N.J.A.C.* 8:43G–2.11(b) (dispensing with individual licenses for separate hospital buildings and services located on same or adjoining grounds if operated under one management). *But see N.J.A.C.* 8:43G–2.11(c) (indicating that hospital's off-site ambulatory care service facility presumed to be "free-standing" unless sufficient clinical, financial, and administrative integration with, and supervision by, hospital is demonstrated to satisfaction of licensing authority).

The regulations adopted by the hospital licensing authority, the Department of Health and Senior Services, reflect an appreciation for the precious nature of space within the confines of a hospital's main facility. Thus, hospitals have been permitted to move functions out of the "main" hospital facility to adjoining property without the need for securing separate licensure, provided that the services are under one management. *See N.J.A.C.* 8:43G–2.11(b). Certain limited types of medical operations can even be moved to non-adjoining property and yet may be regarded as sufficiently integrated with the main hospital to be classified as hospital-based, and not free-standing. *See N.J.A.C.* 8:43G–2.11(c). Thus, hospital activities have been allowed some flexibility to migrate from a hospital's main campus, but in a controlled way and subject

to close regulation. It cannot be overlooked, however, that to remain "hospital-based" in a regulator's eyes, a distant hospital-operated medical service is required to show incorporation with hospital departments, supervision by hospital administrators, and adherence to common policies and procedures for administrative matters, including admission of patients without regard to ability to pay, in order to keep such distant operations to the same standards that patients could expect from a hospital's main facility. *Ibid.*

Our perusal of the aforementioned regulations is not intended to equate various levels of licensure as conclusive on the question of whether the use of particular hospital property should be considered eligible for tax-exempt status.[15] That said, we do recognize the following principles for use when courts engage in the fact-sensitive task of reviewing the tax-exempt eligibility of particular hospital property.

First, we hold that the definition of a hospital as a twenty-four-hour continuous care operation is overly restrictive for purposes of the analysis. The early hospital tax-exemption cases did not focus on the range of *medical* activities engaged in by entities actually organized to operate *as* hospitals. *Cf. Rutgers Cmty. Health Plan, supra,* 7 *N.J.Tax* at 506–07 (distinguishing HMO clinic from hospital). To meet its immediate case needs, the *Rutgers Com-*

---

[15] We note that in *Rutgers Community Health Plan, supra,* the court also relied on hospital-licensing regulatory provisions when searching for an accepted expression of a hospital's authority (reduced to a definitional statement of the term "hospital"), of which the Legislature would have been aware. 7 *N.J.Tax* at 503 n. 4. Imputing to the Legislature knowledge of a regulatory definition that would have controlled hospitals in New Jersey at that time, the court concluded that the Legislature had acquiesced to that definition when amending the tax exemption statute, *N.J.S.A.* 54:4–3.6, without modifying the term "hospital purposes" or altering the regulations in any way. *Ibid.* Since then, the Legislature's authority to challenge regulations with which it disagrees has only increased, *see N.J. Const.* art. V, § IV, ¶ 6 (granting to Legislature authority to invalidate rule or regulation that is inconsistent with legislative intent), and therefore we find that we too can comfortably rely on the Legislature's awareness of those activities that current regulations permit hospitals to do.

*munity Health Plan* court resorted to definitional sources to find the distinguishing feature or features of a "hospital." Such generalized definitions reduced the essence of a hospital to the explanation found in the *Rutgers Community Health Plan* case—a twenty-four-hour, continuous care medical and nursing operation—which was sufficient, in that case, to differentiate the HMO clinic at issue from a true full-service hospital. However, the reference to a hospital's ability to provide twenty-four-hour continuous care to an inpatient population, or to emergency victims, does not incorporate a hospital's larger role as an expected and, to be sure, legitimate, provider of numerous patient services.

■ Instead, we believe that the core aspects of a hospital's purposes are to address the needs of all of the types of patients that a hospital is expected to serve. Therefore, we hold that any medical service that a hospital patient may require pre-admission, during a hospital stay (whether it is for less than a day or for one or more days), or post-admission, constitutes a presumptive core "hospital purpose" under *N.J.S.A.* 54:4–3.6. Our definition amplifies the more abbreviated explanation of "hospital purposes" previously articulated in connection with *N.J.S.A.* 54:4–3.6 applications.

■ Second, we further hold that whether the hospital delivers such services in the hospital's main facility, in another facility on the main campus, or in a hospital-owned building adjoining or adjacent to the main hospital campus, makes no difference in the analysis for a statutory exemption under *N.J.S.A.* 54:4–3.6's use-for-an-exempt-purpose criteria. The use is presumptively for core "hospital purposes." Unless the hospital activity is precluded for a licensing reason, *see N.J.A.C.* 8:43G–2.11(b) (requiring common hospital management), and assuming there is no other reason disqualifying the property's use from tax-exemption eligibility, the property should be deemed tax-exempt eligible under the actual-use requirement of *N.J.S.A.* 54:4–3.6.

■ Third, as the hospital-used property is situated away from the main hospital campus and adjacent or adjoining property,

concerns about hospital integration and supervision become more pronounced, even when the use is for a core hospital purpose as identified above. In such circumstances, it is relevant that regulators examine off-site medical care facilities for functional integration and for supervision by hospital personnel for reasons complementary to the reasons that we strictly apply the tax exemption to buildings actually used for "hospital purposes" under *N.J.S.A.* 54:4–3.6. *See N.J.A.C.* 8:43G–2.11(c).

For tax-exemption examination purposes, then, we incorporate much of the test devised by the Tax Court below, taking into account the expertise and experience of that tribunal in recognizing the salient features in favor of, or against, tax exemption in these fact-sensitive inquiries. *See Alpine Country Club v. Borough of Demarest,* 354 *N.J.Super.* 387, 390, 807 *A.*2d 257 (App.Div. 2002). The Tax Court's factors, adopted by the Appellate Division, identify several relevant considerations to be weighed when assessing the degree to which a facility's use is integrated into the hospital's delivery of core "hospital purposes." The test here is not to determine the worthiness of the "hospital purpose" for we have identified the breadth of such "purposes" earlier in our analysis. Rather, the following inquiries will test the importance and the integration of the proposed use to the hospital's accomplishment of a legitimate task. Toward that end, the factors that a court should consider include:

1. The nature and extent of the services provided at the off-site location;

2. The extent to which the activity conducted in the facility is under the control or supervision of the hospital medical staff, or personnel;

3. Whether the facility serves primarily hospital patients and employees or primarily members of the general public.[16]

Two additional considerations should be included in the analysis under factor three above when the hospital's off-site activity is not

[16] In this regard, we agree with the Tax Court's factual determination that the CP Rehab patients were patients of HMC and would reach the same conclusion for the PT patients served at the Center. *See, e.g., N.J.A.C.* 8:43G–2.11(c) (setting standards for hospital-based ambulatory care service facilities in respect of patient medical records, billing, and access to all hospital services).

one for which the hospital has been licensed to perform off site by regulatory authorities. *See, e.g., N.J.A.C.* 8:43G–2.11(c). Although neither should be treated as dispositive, they are: (1) whether the facility competes with like commercial or privately owned facilities; and, even if the answer to (1) is in the affirmative, (2) whether the facility, or the particular disputed part, is actually used predominantly by patients and hospital employees or by commercial members. In respect of the latter consideration, we add that this part to the analysis does not replace the separate consideration for eligibility under *N.J.S.A.* 54:4–3.6, namely that an endeavor not be established or run as a profit-making operation.

### B.

Based on the test articulated herein, we are uncertain that the Tax Court's determination in respect of the PT Service, to which we would ordinarily accord substantial deference, should be affirmed. The integration of that Service with the HMC seemed to be coextensive with that found for the CP Rehab Service. Also, because our definition of core "hospital purposes" would presumptively include the delivery of physical therapy services on an outpatient basis, which could be, and were at one time, provided at the main HMC campus, we question whether the PT Service at the Center should receive different treatment. Last, to the extent that the court required medical supervision, our analysis eschews such a narrow approach to the type of supervision required.

To ensure that this remaining matter is thoroughly, and properly, examined, we remand for re-examination of the PT Service. To avoid any misunderstandings on remand, we clarify that the only portion of the facility that we view as part of this remand is the PT Service space on the second floor of the Center. We narrowly viewed the question that was presented and granted on certification.[17] We therefore hold that the only issue in this

---

[17] In its petition for certification, HMC sought review solely for its PT Service, stating "HMC does not challenge the Appellate Division's ruling with respect to

appeal was the tax-exempt eligibility of the PT Service's second-floor space.

## VI.

For the reasons expressed herein, the judgment of the Appellate Division is affirmed in part and reversed in part, as modified herein. The matter is remanded to the Tax Court for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

the medically based fitness center and the pediatric practice. Therefore, the sole issue is whether the use of the subject property for the PT services was a use for 'hospital purposes' within the meaning of *N.J.S.A.* 54:4–3.6."